## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 92-CA-00711-SCT

*JUNIOR FOOD STORES, INC. D/B/A SUPER STOP*

*v.*

*RALPH RUSSELL RICE, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/8/92 |
| TRIAL JUDGE: | HON. CHESTER A. HENLEY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| | FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | DIANE V. PRADAT |
| | JOSEPH L. MCCOY |
| ATTORNEY FOR APPELLEE: | WM. ANDY SUMRALL |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 3/21/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/11/96 |

### BEFORE DAN M. LEE, C.J., SULLIVAN, P.J., AND PITTMAN, J.

### PITTMAN, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. On February 22, 1989, the plaintiff, Ralph Russell Rice, Jr., (hereinafter "Rice") filed a complaint against Junior Food Stores, d/b/a Super Stop, (hereinafter "Super Stop"), alleging malicious prosecution by Super Stop for causing an affidavit to be issued charging him with grand larceny. Super Stop, in its answer, denied the allegations of malicious prosecution and averred that it did have probable cause in having the affidavit issued. On April 1, 1992, they held a trial in the Circuit Court of the First Judicial District of Hinds County, Mississippi. before the Honorable Chet Henley, sitting as Special Circuit Court Judge. After the close of the plaintiff's case, the defendant made its motion for a directed verdict which the court denied. Thereafter, the defendant put on its proof and renewed its motion for a directed verdict after the close of its case in chief. The court denied this motion and the case went to the jury. After deliberation, the jury came back with a verdict in favor of Rice for $15,000.

¶2. Super Stop filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Rice filed a motion for an additur and Super Stop, by motion ore tenus, requested a remittitur. All motions were denied, and on July 2, 1992, Super Stop filed its Notice of Appeal to this Court. Super Stop, on July 9, 1992, filed a second Notice of Appeal with an amended certificate of service.

¶3. The issues on appeal to this Court are as follows:

> *I. WHETHER THE PLAINTIFF FAILED TO PROVE ALL THE NECESSARY ELEMENTS REQUIRED FOR A MALICIOUS PROSECUTION CLAIM.*
>
> *II. WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION OF THE APPELLANT FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.*
>
> *III. WHETHER A REMITTITUR SHOULD HAVE BEEN ORDERED BECAUSE THE VERDICT WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE AND WAS THE RESULT OF BIAS, PREJUDICE OR PASSION.*

## STATEMENT OF THE FACTS

¶4. The facts relevant to issues involved in this case center on whether Super Stop, through its representative, had probable cause to initiate criminal proceedings against Rice for grand larceny and whether it did so without malice. Super Stop caused an affidavit to be issued against Rice for grand larceny as a result of the theft of money from the Super Stop store (hereinafter "Briarwood store") number 27 located at Briarwood Drive and Northside Drive (or North State Street) on or about December 6, 1987.

¶5. Rice, an employee of Super Stop for more than three years, normally worked at Super Stop store number 41 on the late shift from 11:00 p.m. through 7:00 a.m. In performing his duties as a clerk at the store, Rice did paperwork, made the deposits, stocked and cleaned the store, waited on customers and ran the cash register. Beginning on Monday of the week of December 5, 1987, Rice was sent to the Briarwood store to work as a substitute for supervisor Daniel Harris who was on vacation that week. The Briarwood store's hours extended until midnight and Rice was put on the 3:00 p.m. through 12:00 midnight shift. Rice's duties at the Briarwood store were the same as those at his usual store and included stocking and cleaning the store, dipping the gas tanks and handling the gas, running the cash register, and doing the paperwork.

¶6. On Saturday night, December 5, 1987, Rice worked the late shift at the Briarwood store, closed the store at midnight, and by the time he had finished his paperwork, it was between 1:30 a.m. and 2:00 a.m. Rice testified that he did the paperwork involving the money, counted the money, wrapped the paperwork around the money, placed both in the safe and locked the safe. The safe key was placed in the register where it was normally kept. Thereafter, Rice turned on the burglar alarm, locked the doors to the outside, and left the store. It was Rice's responsibility to close the store at the end of his shift, place the money to be deposited the next day in the safe, lock the safe, turn on the alarm system and lock all doors before leaving for the night. After leaving the Briarwood store, Rice took the Briarwood store key to his regular store, and left the key with the employee there, as was the custom for Super Stop.

¶7. On the morning of December 6, 1987, a Sunday, Earnestine Junior arrived at the Briarwood store to begin her 6:00 a.m. to 3:00 p.m. shift. Upon her arrival, she found that the front door was unlocked. She entered the store and found the safe door open. There was no noticeable damage to the front door or the

safe door. The money and report sheet that should have been in the safe were missing. Ms. Junior subsequently called either Harry Hammond, the district manager, or a Mr. Burns upon her discovery of the missing money.

¶8. That same morning, Hammond called Rice at home and told him that the door of the Briarwood store had been opened and someone took the money. Hammond also asked Rice how much money had been left in the safe to be deposited. Rice told Hammond that he had left a slip of paper with the totals lying in the garbage. According to Rice, there was around $2,900 in the safe that night, and Hammond found the paper showing such in the garbage. Rice returned to the Briarwood store that Sunday evening at 3:00 p.m. to work the shift that he had been working there. He repeated the same closing procedures that he had done the previous night, including counting the money, putting it in the safe with the paperwork, locking the doors, and taking the Briarwood-store key to his usual store and placing the key in the register at that store.

¶9. On Monday morning, December 7, 1987, Rice was contacted at home by Daniel Harris, a supervisor at the Briarwood store who had just returned from a vacation, and told to take a polygraph test. That same day, Daniel West, a licensed polygraph examiner, gave to Rice a polygraph test in West's office. Super Stop hired West to give the test and had employed him since 1981. The questions to be asked were listed on a report sheet and previewed by Rice before taking the test. Rice also signed a waiver giving West the right to test him and indicating that he took the test voluntarily. West administered only one test to Rice, but he ran three separate charts on each question. In West's opinion, the results from the test indicated deception in some of the answers that Rice gave, including his answers that he put the money in the safe, that he did not take the money, and that he does not know the location of the money. Rice, however, testified that West told him that the results were inconclusive and to come back later to take the test again. He also informed West that he was tired from a lack of sleep the night before the examination. West admitted that a lack of sleep or being upset can affect the test which works off the central nervous system and part of the autonomic nervous system. Later, Rice went to work at his usual store on his usual shift from 11:00 p.m. through 7:00 a.m.

¶10. Including Rice, Super Stop required that three employees (who also had worked the day prior to when the money was discovered missing) take polygraph examinations. The other two employees, who took the test and showed no deceptions, were not present at the time that Rice took the test. West could not remember when he gave the test to Rice or to the other two employees, but he said that the other two employees took the test within a day or two. Other employees who had keys to the store and at least three former employees who had keys when Super Stop employed them were not questioned or given polygraph examinations. West admitted that polygraph examinations can result in erroneous conclusions and are not 100% accurate.

¶11. After giving the test, West called Hammond to report the results of the examination. He then sent the report documenting the results to Hammond. Hammond subsequently signed an affidavit to be issued against Rice because he believed Rice was responsible for the missing money.

¶12. When Rice arrived at his usual store on Monday night at 11:00 p.m. to begin his shift, a person was working in his place and told Rice that Hammond wanted Rice to call him. Rice called Hammond who told Rice that if he wanted to keep his job, he needed to be at the office of Super Stop in the morning. The next day when Rice appeared at the main office of Super Stop, Hammond accused him of taking the money from the Briarwood store. Hammond then told Rice that he was terminated and that there was a warrant

out for his arrest. The Jackson Police Department came and arrested Rice at the Super Stop office, placed handcuffs on him and took him to the police station. At the police station, they interrogated Rice, took fingerprints and photographs, and booked him. He was charged with grand larceny. Rice's parents came to the police station shortly thereafter and posted bail, paying a bonding company $585. He also paid a wrecker fee for his automobile, an impound fee, and hired an attorney to defend him.

¶13. On the charge of grand larceny, the grand jury returned a "no bill" against Rice. At trial, Rice stated that he had no proof that Hammond had him arrested for any reason other than prosecuting him for a crime that Hammond thought that he had committed. However, Rice subsequently stated on redirect examination that while he could not prove it, he was confident that Hammond prosecuted because Rice had Hammond's son or relative arrested on a Friday night before the theft occurred. On Sunday night after the theft, the person that Rice had arrested on Friday night came into the store wearing a name tag with "Hammond" on it.

¶14. Faye Lundy, a co-manager at Rice's usual store, knew Rice and worked the 7:00 a.m. through 3:00 p.m. shift. She testified that she knew Hammond and that Hammond had three kids. The oldest child was 10 or 11 years old and lived in Texas with Hammond's ex-wife, and the two other children were not old enough to be in the third grade. Lundy believed that Hammond had no other relatives in Jackson, but she indicated that she did not know all of his family and that she could not say whether or not someone was there on that Friday night. Also, Lundy testified that they transferred her to the store where Rice usually worked after all of the crew, except for Rice, at the store had been fired because of inventory shortages. Lundy indicated that Rice resented her because she would move the cash register to a different side of the counter every time she worked on her shift. She stated that on occasions, Rice said that he did not like the way that Super Stop treated him, and he would say that "one of these days, I'm going to hit them, and when I do, I'm going to clean them out." Rice denied having ever made such threats. Lundy admitted that Rice never told her that he had a vendetta against anyone or was mad at anyone.

¶15. Rice testified that the prosecution by Super Stop was bad on his nerves, but that he did not see a doctor because of the high cost involved. His reputation among his friends was not damaged as a result of the arrest, and the incident did not cause Rice to have any physical illness. However, Rice testified that he was unable to get a job because of the incident, and his self esteem and social life suffered. He tried to find employment elsewhere, went to the Job Service, and completed job applications at numerous places. When Rice listed Super Stop on a job application, he would not get the job; when he did not list Super Stop on a job application, he got a job. After one year from the time of the incident, Rice found temporary or low-paying jobs at various times. These jobs included laying floor tiles with Benny Dunham, working with Howard's Air Conditioning and Refrigeration, delivering phone books for a day and a half, remodeling his parent's home, and working for Day Detectives for six weeks. Day Detectives had no knowledge of the arrest. Rice obtained full time employment in August 1991 at Universal Converter and is still employed there as an assistant machine operator.

¶16. Because of his filing the civil suit, Rice testified that he could not get into the National Guard as he had planned. In a deposition taken on August 21, 1989, Rice stated that he could not get into the National Guard until he lost three pounds. On redirect examination, Rice indicated that his being overweight was the problem at one point, but that later the problem was the pending civil suit.

¶17. Hazel Rice, Rice's mother, testified that Rice currently resides with her and did so at the time of the

arrest. Mrs. Rice stated that the arrest and charge had a devastating effect on her son, that he was in a state of shock, that the whole family was depressed, that it made him nervous, that he had no social life thereafter, and that the incident turned him against society and the law. It took all of his money to pay his arrest bills. She also testified that he would go to the unemployment office every week, would receive job notices, and would go look for jobs. Until he found his present job, he only found menial or temporary jobs.

¶18. Concerning his loss of income, Rice testified that while employed at Super Stop, he made $7,000 - $10,000 in 1985, $10,500 - $11,000 in 1986, and $11,500 - $12,000 in 1987. Because he was unemployed in 1988, the year following the incident, his total income was nothing. Rice made $3,300 in 1989 and $4,000 in 1990.

¶19. The jury returned a verdict in favor of Rice and awarded him $15,000 as damages.

## DISCUSSION OF THE LAW

### I. WHETHER THE PLAINTIFF FAILED TO PROVE ALL THE NECESSARY ELEMENTS REQUIRED FOR A MALICIOUS PROSECUTION CLAIM?

¶20. Super Stop argues that Rice failed to meet all of the necessary elements required to sustain a malicious prosecution claim. The elements of malicious criminal prosecution are:

(1) the institution or continuation of original judicial proceedings, either criminal or civil;

(2) by, or at the insistence of the defendants;

(3) the termination of such proceeding in plaintiff's favor;

(4) malice in instituting the proceedings;

(5) want of probable cause for the proceedings; and

(6) the suffering of damages as a result of the action or prosecution complained of.

*Bankston v. Pass Road Tire Center, Inc.,* 611 So. 2d 998, 1004 (Miss. 1992); *C & C Trucking Co. v. Smith,* 612 So. 2d 1092, 1099-1100 (Miss. 1992); *Page v. Wiggins,* 595 So. 2d 1291, 1293 (Miss. 1992); *Strong v. Nicholson,* 580 So. 2d 1288, 1293 (Miss. 1991); *Miss. Road Supply v. Zurich-American Ins. Co.,* 501 So. 2d 412, 414 (Miss. 1987); *Royal Oil Co., Inc. v. Wells,* 500 So. 2d 439, 442 (Miss. 1986); *Pugh v. Easterling,* 367 So. 2d 935, 937 (Miss. 1979).

¶21. To prevail in a malicious prosecution suit, the plaintiff must prove all six elements of the tort by a preponderance of the evidence. In the case at bar, Super Stop admitted the first three elements to wit: that it had instituted, through its representative, criminal proceedings against Rice, and that the criminal proceedings were terminated in favor of Rice when the grand jury returned a "no bill" against Rice on the grand larceny charges. Thus, Rice only had to prove: (1) that Super Stop had malice in instituting the proceedings, (2) that Super Stop had no probable cause for the proceedings, and (3) that he suffered damages or injury as a result of the prosecution. Super Stop contends that Rice failed in his attempts to establish each of these three elements.

¶22. In Mississippi, to determine if a defendant acted with malice in instituting a criminal proceeding, we must look to the defendant's subjective state of mind. *Owens v. Kroger Co.,* 430 So. 2d 843, 846 (Miss. 1983). "'Malice' in the law of malicious prosecution is used in an artificial and legal sense and applied to a prosecution instituted primarily for a purpose other than that of bringing an offender to justice." *Benjamin v. Hooper Elec. Supply Co., Inc.,* 568 So. 2d 1182, 1191 (Miss. 1990). Circumstantial evidence may prove the element of malice, or the jury may infer malice from the facts of the case. *C & C Trucking*, 612 So. 2d at 1100. This Court has also held that the absence of probable cause for a prosecution is circumstantial evidence of malice, and the jury may infer malice from a finding that the defendant acted in reckless disregard of another person's rights. *Id*.

¶23. Furthermore, malice is a question of fact to be determined by the jury unless only one conclusion may reasonably be drawn from the evidence. *C & C Trucking*, 612 So. 2d at 1100; *Benjamin*, 568 So. 2d at 1191; *Owens*, 430 So. 2d at 848. As grounds for malice, Rice testified that Hammond prosecuted him because Rice had Hammond's son or a relative arrested at the store on a Friday night before the theft occurred. He further testified that on Sunday night after the theft, the person that Rice had arrested on Friday night came into the store wearing a name tag with "Hammond" on it. To dispute this testimony, Faye Lundy, a co-manager at Rice's usual store, testified that she knew Hammond and that Hammond's oldest child was only 10 or 11 years of age and lived in Texas with Hammond's ex-wife. His other two children were not old enough to be in the third grade. Lundy believed that Hammond had no other relatives in Jackson, but she indicated that she did not know all of Hammond's family and that she could not say whether or not someone was at the Briarwood store on that Friday night. Hammond was not present at trial to rebut Rice's allegations, but his stipulated testimony was that he intended no malice toward Rice, and he only wanted to be certain that justice was done.

¶24. The absence of probable cause for the prosecution is or can be circumstantial evidence of malice. *C & C Trucking*, 612 So. 2d at 1100. The lack of probable cause for the prosecution may give rise to the inference that the defendant acted with malice.

¶25. Consideration of the facts apparent to the observer at the time that prosecution is initiated determines probable cause. *Owens*, 430 So. 2d at 846. "Probable cause requires the concurrence of an honest belief in the guilt of the person accused and reasonable grounds for such belief." *C & C Trucking,* 612 So. 2d at 1100; *Strong,* 580 So. 2d at 1294; *Royal Oil,* 500 So. 2d at 443; *Harvill v. Tabor,* 240 Miss. 750, 755, 128 So. 2d 863, 865 (1961). "One is as essential as the other." *Bankston,* 611 So. 2d at 1006. This Court has declared that unfounded suspicion and conjecture are not proper bases for finding probable cause. *Benjamin*, 568 So. 2d at 1190.

¶26. "When the facts are undisputed, it is the function of the court to determine whether probable cause existed."*Benjamin,* 568 So. 2d at 1190 (citing *Owens,* 430 So. 2d at 846). However, when the facts and reasonable inferences deduced from those facts are in dispute, the issue becomes a jury question and it is within their province to determine based upon proper instructions. *Benjamin,* 568 So. 2d at 1190; *Owens,* 430 So. 2d at 846.

¶27. In addressing the proof required to establish a lack of probable cause, this Court has stated:

> Want of probable cause may be proven by circumstantial evidence, but it is ordinarily necessary for the plaintiff to show circumstances from which the absence of probable cause may be inferred. *Royal Oil,* 500 So. 2d at 444. If the evidence is such that the jury could have believed the prosecution was

instituted without probable cause then that issue should go to the jury.

*Benjamin,* 568 So. 2d at 1190. *Cf. Royal Oil,* 500 So. 2d at 444 (if evidence is such that jury could have believed that the prosecution was instituted without probable cause, the judgment appealed from should not be disturbed).

¶28. Super Stop argues that it had probable cause to institute proceedings against Rice for grand larceny. The stipulated testimony of Hammond indicated that he signed an affidavit to be issued against Rice because he believed that he had probable cause to suspect that Rice stole the missing money. Hammond based this belief on the following factors: (1) the plaintiff failed the polygraph and the other two employees passed the polygraph, (2) the plaintiff was one of three people who had keys to the store, (3) the plaintiff worked the last shift and was responsible for the missing money, and (4) the plaintiff showed deception when questioned about the missing money on the polygraph. In addition, the door to the store and the safe showed no signs of forced entry, and Rice worked the last shift at the store.

¶29. This Court has stated that "where a reasonable person would investigate further before instituting a proceeding, **the failure to do so is an absence of probable cause**."*Benjamin,* 568 So. 2d at 1191(emphasis added). To determine whether a reasonable person would have investigated further before instituting felony proceedings against Rice, we need only look at the proof available to Super Stop at the time it caused the arrest of Rice.

¶30. Other employees and possibly past employees had keys to the store. Apparently, not all employees who had keys to the store or had access to the keys were subjected to polygraph examinations. It is possible that the other two employees who took polygraph examinations and passed did so after Rice's arrest and not before. No evidence indicates that Super Stop sought the advice of an attorney before instituting criminal proceedings. Not one witness was found that could implicate Rice in the theft. None of the missing money was found in Rice's possession. In fact, the only evidence unique to implicating Rice as the thief as opposed to any other employee was the results of a polygraph examination conducted by West, whom Super Stop had employed on a regular basis since 1981. At trial, West admitted that polygraph examinations can result in erroneous conclusions and are not 100% accurate[1]. Polygraph tests are not admissible as evidence and should be given only minimal weight when used to substantiate probable cause. We continue to follow the admonition of *Thorson v. State,* 653 So. 2d 876 (Miss. 1994)(results of polygraph tests have not reached that stage in scientific reliability justifying their competency as substantive evidence). Thus, from the foregoing facts, the jury could reasonably have believed that Rice had done no wrong and that there was no reasonable basis for a belief of the contrary.

¶31. It is apparent from the verdict that the jury resolved conflicts in the testimony in favor of Rice. When the testimony of the witnesses is viewed in the light most favorable to the verdict, the jury finding of no probable cause is not an unreasonable one. *Royal Oil,* 500 So. 2d at 444.

¶32. As far as damages are concerned, Super Stop stated that Rice failed to establish this element of the tort of malicious prosecution. However, nowhere within this assignment of error did Super Stop discuss the merits of this argument or offer any authority to support such a contention. Evidence adduced at trial shows that Rice was arrested, handcuffed at the main office of his employer, carried to the police station, interrogated, booked, fingerprinted, and charged with grand larceny. Money expended by Rice or on his behalf because of the criminal charge included $585 to the bonding company, a wrecker fee of $25, a vehicle impound fee of $40, a $120 fee to the City of Jackson for an unknown fee, a fine of $197 for

marijuana that was found in his possession upon his arrest, and $1,500 to hire an attorney to represent him in his defense. Also, Rice testified that the prosecution was bad on his nerves, that his self-esteem and social life suffered, and that he was unable to secure employment as a result of the prosecution. In addition, Rice testified that he did not have any income in 1988, and his income for 1989 and 1990 was reduced because of his inability to obtain employment. Rice's total income while employed at Super Stop in 1987 was $11,500 -$12,000.

¶33. Hazel Rice, Rice's mother, corroborated some of Rice's testimony when she stated that the arrest had a devastating effect on her son, that he was in a state of shock, that he was depressed, that it made him nervous, that he had no social life thereafter, and that the prosecution turned him against society and the law. She also testified that he would go to the unemployment office every week after the incident, would apply for various jobs, and would find only menial or temporary jobs until he found his present job.

¶34. Unless the reviewing court can say that no reasonable jury could have assessed the damages awarded based on the proof at trial, the award must be left undisturbed. *City of Jackson v. Locklar*, 431 So. 2d 475, 481 (Miss. 1983). Moreover, when a jury returns a verdict in favor of the plaintiff, this Court resolves all conflicts in the evidence in the plaintiff's favor. *Id.* at 477.

¶35. Based upon the evidence and testimony presented at trial, it appears that a reasonable jury could have awarded damages in this case. "Our cases have long recognized that a plaintiff in a malicious prosecution action may recover damages for harm to reputation resulting from the accusation brought against him and mental anguish or distress causally resulting from the malicious prosecution." *Royal Oil*, 500 So. 2d at 448. Ample evidence existed to prove the element of damages.

### II. WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION OF THE APPELLANT FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL?

¶36. Super Stop argues that the jury verdict is against the overwhelming weight of the evidence and is contrary to law. After the jury verdict was rendered, Super Stop filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, motion for a new trial, which was denied by the trial judge.

¶37. The standard of review for jury verdicts in this state is well established. In the case of *Bell v. City of St. Louis*, this Court stated the standard as follows:

> Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found.

*Bell v. City of St. Louis*, 467 So. 2d 657, 660 (Miss. 1985).

¶38. In examining the decision of a trial judge to refuse to grant a motion for JNOV, this Court has said:

> [W]e examine all of the evidence--not just evidence which supports the non-movant's case--in the light most favorable to the party opposed to the motion. All credible evidence tending to support the non-movant's case and all favorable inferences reasonably drawn therefrom are accepted as true and

redound to the benefit of the non-mover. If the facts and inferences so considered point so overwhelming in favor of the movant that reasonable men could not have arrived at a contrary verdict, the motion should be granted. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the jury verdict should be allowed to stand and the motion denied, and, if it has been so denied, we have no authority to reverse. The principles are as applicable in malicious prosecution cases as any other.

*C & C Trucking*, 612 So. 2d at 1098 (citations omitted).

¶39. Examining all of the evidence in the light most favorable to Rice and accepting all favorable credible evidence tending to support Rice's case and all favorable inferences drawn therefrom as true, it appears that reasonable and fairminded jury members could reach different conclusions. In such a case, the jury verdict should be allowed to stand and the motion denied, provided, of course, that this Court determines that Rice met by a preponderance of the evidence all of the elements of the tort of malicious prosecution.

¶40. In considering a motion for a new trial, the trial judge in exercising his sound discretion may grant the motion thereby overruling the jury's verdict only where such verdict is against the overwhelming weight of the evidence or is contrary to the law. *Bell*, 467 So. 2d at 660. From the discussion in the first assignment of error of the elements required to prove a malicious prosecution and the evidence available to support each element, a reasonable jury considering all of the evidence and making reasonable inferences therefrom could deliver a verdict in favor of Rice.

### III. WHETHER A REMITTITUR SHOULD HAVE BEEN ORDERED BECAUSE THE VERDICT WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE AND WAS THE RESULT OF BIAS, PREJUDICE, OR PASSION?

¶41. A court in Mississippi can disturb a jury verdict if the court finds that the damages are excessive or inadequate for the reason that the jury was influenced by bias, prejudice, or passion, so as to shock the conscience or that the damages awarded were contrary to the overwhelming weight of credible evidence. *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1190 (Miss. 1990). This Court is not authorized to disturb a jury verdict as to damages because it "seems too high" or "seems too low." *C & C Trucking*, 612 So. 2d at 1106.

¶42. In malicious prosecution actions, a person is entitled to recover damages for harm to his reputation resulting from the criminal proceedings brought against him, as well as for mental anguish and distress causally resulting from the proceedings. *C & C Trucking*, 612 So. 2d at 1106. While Rice's reputation, apparently was not barred from the proceedings, it cannot be doubted that he was embarrassed, inconvenienced, and suffered mental distress because of the proceedings. It would seem only reasonable that a person would undergo considerable emotional distress when faced with a felony charge. Moreover, it is common for job applicants to be asked if they have ever been arrested and, if so, for what reason. Rice, if asked this question, would have to admit and explain his arrest.

¶43. This Court has recognized the difficulty of quantifying a monetary award in malicious prosecution actions. *Strong*, 580 So. 2d at 1295. "The matter is further complicated by the jury's task of placing a monetary figure upon mental anguish and emotional distress, key injuries in malicious prosecution actions." *Id.* Rice's damages expressed in monetary terms is a matter of fact. *Locklar*, 431 So. 2d at 480-81.

Unless it could be said that no rational jury could on this proof have assessed damages of $15,000, the award must be left undisturbed. *Id.* at 481.

¶44. It matters not that some members of this Court, had they been sitting as triers of fact, probably would have assessed damages at a lower amount, because this Court reviews jury awards within the constraints of rules of law. *Id*. Rather, the question is whether considering the evidence in the light most favorable to Rice, together with all reasonable inferences which may be drawn therefrom, this Court can say that no reasonable jury could, on the facts in this case, have concluded that Rice's damages were in the amount of $15,000. *Id*.

¶45. After reviewing the evidence of damages suffered by Rice, in light of the nature of damages in malicious prosecution actions as well as the problems involved with quantifying such damages, the jury verdict of $15,000 for damages is supported by the evidence. Furthermore, we cannot say that the verdict is so excessive that it evinces such passion, bias, and prejudice on the part of the jury so as to shock the conscience of this Court.

## CONCLUSION

¶46. Based upon the evidence and testimony presented at trial, Rice proved by a preponderance of the evidence, all six elements of the tort of malicious prosecution. Examining all of the evidence in the light most favorable to Rice and accepting all favorable evidence tending to support Rice's case and all favorable inferences drawn therefrom as true, it appears that reasonable and fairminded jury members could reach different conclusions. In such case, the jury verdict should be allowed to stand and the motion for JNOV denied. Likewise, it was not error for the trial court to deny Appellant's motion for a new trial, because the jury did not depart from its oath and its verdict was not the result of bias, passion, and prejudice.

¶47. Finally, after reviewing the evidence of damages suffered by Rice, in light of the nature of damages in malicious prosecution actions as well as the problems involved with quantifying such damages, the jury verdict of $15,000 for damages is supported by the evidence. Moreover, we cannot say that the verdict is so excessive that it evinces such passion, bias, and prejudice on the part of the jury so as to shock the conscience of this Court.

**¶48. AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. BANKS, J., CONCURS IN RESULT ONLY.**

1. This Court has held that neither the results of a polygraph examination nor the fact that one was taken is admissible as evidence. *Conner v. State,* 632 So. 2d 1239, 1257 (Miss. 1993), *cert. denied***,** *Conner v. Mississippi*, 115 S. Ct. 314, 130 L. Ed.2d 276, 63 USLW 3292 (1994).