IN THE COURT OF APPEALS

7/15/97

OF THE

STATE OF MISSISSIPPI

NO. 96-KA-00030 COA

SUZANNE ILENE TAVARES APPELLANT

v.

STATE OF MISSISSIPPI APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. JOSEPH H. LOPER, JR.

COURT FROM WHICH APPEALED: ATTALA COUNTY CIRCUIT COURT

ATTORNEYS FOR APPELLANT: GRADY F. TOLLISON, JR.

AMY D. WHITTEN

ATTORNEYS FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL

BY: WAYNE SNUGGS BILLY L. GORE

DISTRICT ATTORNEY: DOUG EVANS

NATURE OF THE CASE: CAPITAL MURDER

TRIAL COURT DISPOSITION: CAPITAL MURDER: SENTENCED TO LIFE IMPRISONMENT WITHOUT PAROLE IN THE MDOC.

MOTION FOR REHEARING FILED:7/29/97

CERTIORARI FILED: 9/23/97

BEFORE THOMAS, P.J., DIAZ, AND PAYNE, JJ.

THOMAS, P.J., FOR THE COURT:

Suzanne Ilene Tavares appeals her September 22, 1995, convictions of capital murder and conspiracy to commit murder, raising the following issues as error:

**I. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF "FLIGHT" AND GRANTING A JURY INSTRUCTION ON "FLIGHT", BOTH OF WHICH WERE ERROR UNDER MISSISSIPPI LAW, GROSSLY PREJUDICED THE JURY AGAINST THE APPELLANT, AND DENIED HER DUE PROCESS OF LAW.**

**II. THROUGH A SERIES OF ERRONEOUS RULINGS EXCLUDING THE MENTION OF EVIDENCE OF POLYGRAPH TEST RESULTS, THE TRIAL COURT IMPROPERLY RESTRICTED THE DEFENSE CONFRONTATION OF STATE WITNESS BENNIE CORK, IN VIOLATION OF THE SIXTH AMENDMENT AND STATE LAW.**

**III. THE TRIAL COURT ERRED IN ALLOWING TAVARES TO BE TRIED ON CHARGES OF BOTH CAPITAL MURDER AND CONSPIRACY, AN ERROR FURTHER EXACERBATED BY THE IMPROPER ADMISSION OF CO-CONSPIRATOR'S HEARSAY STATEMENTS AS EVIDENCE AGAINST TAVARES.**

**IV. THE TRIAL COURT ERRED IN IMPOSING AN ILLEGAL SENTENCE OF LIFE WITHOUT PAROLE.**

Finding no error, we affirm.

**FACTS**

The lifeless body of Jerry Tavares, a 39-year-old convenience store owner, was found on the morning of May 12, 1992. Jerry Tavares had been shot three times with a .9 millimeter gun. The police investigation into this matter took a turn when Bennie Cork became a suspect. Cork informed the police that the death of Jerry Tavares resulted from a murder for hire scheme in which Suzanne Ilene Tavares, the deceased's wife, was involved. Also implicated by Cork in the plot to kill Jerry Tavares were Billy Joe Barnett and Glen Dale Davis.

Cork was the "star" witness for the State in Suzanne Ilene Tavares's trial. Cork testified that he was approached by Barnett to "kill a man for him." The next night, Cork met with Barnett and Davis to discuss the murder. Cork agreed to kill Jerry Tavares. Cork, Barnett and Davis picked out a location to kill Jerry Tavares which was close to the store owned by Jerry and Suzanne Ilene Tavares, J.R.'s Highway 12 Mart. Barnett was driven to the Highway 12 Mart by Cork and Davis so Barnett could get Jerry Tavares to come with him to the murder site. Cork and Davis drove back to the location and waited on Barnett and Jerry Tavares to arrive. Barnett and Jerry Tavares arrived in Jerry Tavares's truck about thirty minutes later. Cork stated that when Barnett and Jerry Tavares arrived, Barnett got out and approached Cork. Cork then turned around to walk off because he stated he was not going to kill Jerry Tavares. Cork then heard two shots and immediately turned around. He then saw Barnett stand over Jerry Tavares's body and shoot Jerry Tavares again in the left side of his head.

The three men drove toward Little Mountain, where Cork testified that Barnett told him that he was going to call Jerry's wife, Ilene, and let her know the location of Jerry Tavares's body. Cork stated that Barnett did call a lady named "Ilene." Phone records from the Little Mountain Service Station introduced into evidence showed that a long distance call was made from the service station pay phone at 11:01 p.m. on May 11, 1992. The call was placed to extension 601-547-9363. This is the phone number of the Tavares's home in McCool, Mississippi. After the phone call, the trio left and dropped off Cork in Maben, Mississippi. Cork was given the gun, and it was his job to get rid of the weapon. Cork threw the gun and the bullet clip in a stream the day after the murder. Cork took Attala County Sheriff Troy Steed to the location of the stream and showed him where he had thrown the gun. Both the gun and the clip were recovered from the stream by divers.

Cork was paid $500.00 to get rid of the gun. A $500.00 check dated June 30, 1992, payable from Glen Davis to Bennie Cork was introduced into evidence at trial. Cork stated that he was to be paid by Barnett, but that Barnett had trouble cashing a $1,500.00 check given to him by Suzanne Ilene Tavares. A check dated June 5, 1992, in the amount of $1,500.00 payable to Barnett was introduced into evidence at trial. The check was drawn on the Highway 12 Mart bank account, and signed by Suzanne Ilene Tavares. According to Cork, Barnett asked Davis to write the check to Cork. Davis told Barnett that he did not have enough money in the bank to cover the check to Cork, and that Barnett would have to make a deposit the next day to cover the check. A cash deposit in the amount of $495.00 was made to Davis' checking account on July 3, 1992.

The State also put on testimony from Mark Smith, an acquaintance of Jerry and Ilene Tavares and Billy Joe Barnett. Smith testified that approximately two weeks prior to Jerry Tavares's death, Barnett approached him twice and offered him money and a vehicle to kill Jerry Tavares. Barnett told Smith that he could not pay Smith at that time because he had to wait on some insurance money. Smith declined the offer on both occasions. The weekend before Jerry Tavares's death, Smith traded

a .9 millimeter gun with Barnett. The gun traded to Barnett was the gun used in the murder of Jerry Tavares. The morning following the murder, Barnett approached Smith and told him to call the police and report that the gun had been stolen from Smith's truck.

At the time of Suzanne Ilene Tavares's trial in September of 1995, Barnett had been convicted of capital murder and sentenced to life imprisonment without parole. Bennie Cork, the state's chief witness, had entered a plea of guilty to capital murder and had received a sentence of life imprisonment with eligibility for parole. Davis had not been tried.

## ANALYSIS

## I.

## THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF "FLIGHT" AND GRANTING A JURY INSTRUCTION ON "FLIGHT", BOTH OF WHICH WERE ERROR UNDER MISSISSIPPI LAW, GROSSLY PREJUDICED THE JURY AGAINST THE APPELLANT, AND DENIED HER DUE PROCESS OF LAW.

Tavares contends that the trial court erred when it allowed the State to offer evidence relating to Tavares's failure to appear for trial on the morning of June 26, 1995. Tavares contends that the evidence was improperly characterized by the State as "flight" evidence, and that the inflammatory facts offered under this guise were irrelevant and sensational and diverted the jury's attention onto a prejudicial consideration of the evidence. The State argues that no error was committed by the trial judge. The State asserts that the trial judge made findings of specific fact in the record, and that the

judge admitted the evidence of "flight" after finding the evidence more probative than prejudicial. The State also contends that the jury was properly instructed on the principle of "flight."

Following a prior mistrial in Attala County, Tavares's trial was set for June 26, 1995 in Grenada County, Mississippi. On the morning of June 26, 1995, Tavares failed to appear when court was called to order. Tavares's bond was revoked and a warrant was issued for her arrest. She was located around 7:00 p.m. that night on a gravel road in Attala County by Deputy Hudson of the Attala County Sheriff's Department. Deputy Hudson testified that he met Tavares head-on while traveling on Stonewall Road in Attala County. He recognized Tavares and her car, turned his car around while turning on his blue lights and then pursued Tavares. Tavares sped away from him for approximately four miles. Deputy Hudson stated that he reached speeds of 90 miles per hour and that he estimated Tavares was traveling between 65 and 70 miles per hour during the pursuit. Tavares eventually lost control of her car and crashed into a ditch. Tavares was apprehended and found to be intoxicated. Tavares's car was eventually searched, and several items were removed from the car. Items recovered from the car included: a gun with bullets; $2247.63 in cash; numerous items of female undergarments; twelve pairs of ladies shoes; a various assortment of makeup and hair-care products; family photographs in frames; twelve cassette tapes; a large Rand McNally Road Atlas with pink high-lighter; Jerry Tavares's death certificates; women's jewelry; nineteen shirts; twenty-five pairs of shorts and pants; seven nightgowns; numerous bottles of perfume and cologne; three purses; and other bath items such as soap, shampoo, toothbrushes, body cremes, baby powder, razors, combs,

lotions, feminine napkins, and a box of Q-tips.

Tavares filed a motion in limine to have this evidence excluded from trial. A hearing was had on this matter. Tavares testified in her own defense as to her absence from court and stated that she was taking seizure medicine at the time, and that she had failed to take her medicine in a few days. She claimed to have had a blackout during the day of June 26, 1995. She claimed to not remember anything during the day. However, she did remember what she was wearing on that day and remembered seeing the deputy and asserted that she thought the deputy was chasing after a speeding trucker on the same road. She stated that some of the items found in her car were left over from a trip she had just taken. She also stated that she did not use some of the items in her car anymore and just had not thrown them away.

The trial judge found this evidence admissible as "unexplained flight," and denied the motion. The judge found that Tavares's flight was unexplained and was denied by Tavares from the witness stand. The judge also found that the evidence had considerable probative value of someone that had guilty knowledge of the crime for which they were charged. Further, the judge made a finding of fact that the probative value of the evidence substantially outweighed any prejudicial effect. Also, the jury was instructed on the issue of "flight" during the guilt phase of the trial. The instruction is as follows:

Flight is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Suzanne Ilene Tavares, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all the facts, whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant, Suzanne Ilene Tavares. Flight alone, is never enough for a presumption of guilt.

"An instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." *Brown v. State*, 690 So. 2d 276, 294 (Miss. 1996) (citations omitted). The supreme court has stated that when determining whether a flight instruction is appropriate, two considerations are paramount:

(1) Only unexplained flight merits a flight instruction.

(2) Flight instructions are to be given only in cases where that circumstance has considerable probative value.

*Brown*, 690 So. 2d at 294. *See also Holly v. State*, 671 So. 2d 32, 37 (Miss. 1996); *Banks v. State*, 631 So. 2d 748, 751 (Miss. 1994); *Pannell v. State*, 455 So. 2d 785, 788 (Miss. 1984).

However, flight evidence should not be given where a lower court is aware of independent reasons for a defendant's flight. *Mack v. State*, 650 So. 2d 1289, 1309 (Miss. 1994).

Tavares relies on *Mack* to argue that the instruction should not have been granted and the evidence should not have been admitted. In *Mack*, the defendant was charged with capital murder. *Mack*, 650 So. 2d at 1309. At the time of his flight, the defendant was an escapee from prison and also driving a stolen vehicle. *Id.* The supreme court held that the trial judge erred in finding that evidence of Mack's flight was admissible because Mack had two other reasons for fleeing: he was an escapee and he was driving a stolen vehicle. *Id.* The court found that Mack had an independent basis for fleeing from the police. *Id.*

Tavares contends that her situation is similar to that in *Mack*. She asserts that a totally independent basis existed for her flight from Deputy Hudson: the fact that she was in violation of her bond for failure to appear, and also that she was intoxicated at the time. However, Tavares herself testified that she was not fleeing from Deputy Hudson. She stated that she thought he was in pursuit of a speeding trucker. Therefore, any reliance on *Mack* is displaced as no independent basis existed for Tavares's flight.

From the record, it is clear that Tavares's flight was unexplained. She did not show at her trial in Grenada County on the morning of June 26, 1992, and was apprehended in Attala County later that evening. She sped away from Deputy Hudson causing him to reach speeds of 90 miles per hour in pursuit. She was intoxicated at the time of her "flight" from Deputy Hudson and crashed her vehicle into a ditch. She had everything except "the kitchen sink" in her car when she was apprehended. Based upon these facts, evidence of flight was probative of guilt or guilty knowledge and thus the introduction of evidence and the instruction on flight were warranted.

## II.

### THROUGH A SERIES OF ERRONEOUS RULINGS EXCLUDING THE MENTION OF EVIDENCE OF POLYGRAPH TEST RESULTS, THE TRIAL COURT IMPROPERLY RESTRICTED THE DEFENSE CONFRONTATION OF STATE WITNESS BENNIE CORK, IN VIOLATION OF THE SIXTH AMENDMENT AND STATE LAW.

Tavares argues that the trial judge erroneously excluded the results of two polygraph tests administered by investigatory authorities to Bennie Cork, the State's main witness. Cork pled guilty and received a sentence of life imprisonment with the eligibility for parole. Tavares sought to use the polygraph results for the purpose of impeaching the credibility of Cork's post-arrest statements and his credibility as the star witness for the State. The State contends that the refusal to admit the polygraph results was not erroneous even though the results were offered for the non-substantive purpose of impeachment of Cork.

Prior to trial, Tavares filed a motion to admit the results of two lie detector tests administered by the State on Cork. During a hearing on this matter, Tavares sought to introduce evidence that Cork had failed the two polygraph examinations. The trial judge denied the motion, stating that (1) he was aware of no case in the State of Mississippi that has ever allowed polygraph tests to be admitted; (2) he had no basis to show that polygraph examinations had any scientific reliability; and (3) even if admissible, Cork's test results would be more prejudicial than probative.

The Mississippi Supreme Court has stated that Mississippi law forbids the admission of the results of a

lie detector test. *Carr v. State*, 655 So. 2d 824, 836 (Miss. 1995). Also inadmissible is the fact that a lie detector test has been taken. *Junior Food Stores v. Rice*, 671 So. 2d 67, 75 (Miss. 1996); *Conner v. State*, 632 So. 2d 1239, 1257 (Miss. 1993). "The results of polygraph tests have not reached that stage in scientific reliability justifying their competency as substantive evidence." *Thorson v. State*, 653 So. 2d 876, 893 (Miss. 1994).

Tavares contends that the *Conner* court held that the results of a polygraph examination are admissible for non-substantive purposes. Therefore, Tavares argues that the results of the polygraph test should have been used at trial for non-substantive purposes as impeachment of Cork. In *Conner*, a witness implicated Conner in the death of an elderly woman. *Conner*, 632 So. 2d at 1243. The witness agreed to take a polygraph test. *Id.* at 1257. At trial, the prosecutor made two references to the witness's willingness to take the test. *Id.* Conner asserted that this was error because it bolstered the testimony of the witness and unfairly prejudiced the defense. *Id.* The supreme court held the references to the witness's willingness to take the test were not error because the defense had sought to impeach the witness's veracity while cross-examining him. *Id.* at 1258-59. In essence, what the *Conner* court held admissible was the fact that the witness agreed to take a polygraph test and nothing more.

In the case *sub judice*, Tavares wanted to, in a round about way, introduce the results of Cork's polygraph tests to impeach his testimony. Tavares was not concerned about Cork's willingness or reluctance to take the test. Tavares wanted the results of those tests put into evidence for impeachment purposes. The results of a lie detector test are inadmissible under Mississippi law. *Carr*, 655 So. 2d at 836; *Conner*, 632 So. 2d at 1257. The trial court did not err by excluding the results of Cork's polygraph examinations.

## III.

**THE TRIAL COURT ERRED IN ALLOWING TAVARES TO BE TRIED ON CHARGES OF BOTH CAPITAL MURDER AND CONSPIRACY, AN ERROR FURTHER EXACERBATED BY THE IMPROPER ADMISSION OF CO-CONSPIRACY'S HEARSAY STATEMENTS AS EVIDENCE AGAINST TAVARES.**

Tavares contends that the trial judge erred in allowing her to be tried on charges of both capital murder and conspiracy. She also contends that this error was made more severe by the improper admission of Cork's statements against her. Tavares argues that the trial court erred by handling the hearsay statements tendered by the State as non-hearsay co-conspirator's statements under Rule 801(d)(2)(E) of the Mississippi Rules of Evidence. The State argues that Cork's hearsay statements were admissible by virtue of Rule 801(d)(2)(E), and that the fact findings made by the lower court were not clearly erroneous and were supported by substantial credible evidence.

Following trial, Tavares was sentenced separately to terms of life without parole for the capital murder and twenty years for the conspiracy charge. The defense raised the issue of double jeopardy in its motion for new trial. After a hearing on the matter, the trial judge vacated Tavares's conviction for conspiracy and the twenty year sentence which was imposed. The trial judge's ruling was based on *Stewart v. State*, 662 So. 2d 552, 564 (Miss. 1995), in which the supreme court held that a

conviction of murder-for-hire may not co-exist with a conviction for conspiracy to commit capital murder.

The Mississippi Supreme Court has dealt with the issue of conspiracy. The conspiracy law provides that:

For there to be a conspiracy, "there must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose." The conspiracy agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence.

*Franklin v. State*, 676 So. 2d 287, 288 (Miss. 1996) (*quoting Nixon v. State,* 533 So. 2d 1078, 1092 (Miss. 1987)).

Rule 801(d)(2)(E) of the Mississippi Rules of Evidence provides:

A statement is not hearsay if: (2) The statement is offered against a party and is (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Statements made during the course of and in furtherance of the conspiracy are not hearsay. *Martin v. State*, 609 So. 2d 435, 439 (Miss. 1992). The status of the speaker controls, and the person making the statements need not be a conspirator. *Id.* However, statements made after the conspiracy has either succeeded or failed are inadmissible. *Krulewitch v. U.S.*, 336 U.S. 440, 442 (1949).

The phrase "in the course of and in furtherance of the conspiracy" has been interpreted by the Mississippi Supreme Court. In *Nixon*, the court was faced with the situation in which several statements were made by three conspirators after the murder had taken place. *Nixon*, 533 So. 2d at 1092. The court held that the statements "were admissible because the murder-for-hire conspiracy did not end until at the earliest, the conspirators had knowledge that payment had been made." *Id.* The court stated that the trial court committed no error by allowing the witness to repeat during the trial the statements made by the co-conspirators. *Id.* at 1092-93.

Tavares argues that parts of Cork's testimony were wrongly admitted as outside the scope of the conspiracy. Specifically, Tavares contends that the conversations concerning payment of Cork for his role in the murder occurred some time after the murder was completed, and that the statements were not made in the furtherance of the conspiracy. However, based on the language in *Nixon*, this argument must fail. Cork testified to events that occurred prior to Jerry Tavares's death, immediately after the death, and also testified concerning statements made to him concerning his payment. Under *Nixon*, all of these statements were "in the course of and in furtherance of the conspiracy."

Tavares next argues that the State's predicate proof of conspiracy was insufficient. Tavares contends that before admitting the hearsay statements of Cork, the State must prove that Tavares joined with others to accomplish an unlawful purpose. Tavares is correct in her assertion, as is evidenced by the

*Nixon* case. A conspiracy must be established prior to Cork's testimony. *Nixon*, 553 So. 2d at 1078.

However, our review of the matter is quite different than that of the circuit court. At the trial level, the prosecution is entitled to offer evidence of plan and motive to employ the Rule 104 procedure to establish Rule 801(d)(2)(E) admissibility by showing that a conspiracy preceded consummation of the principal offense. *Ponthieux v. State*, 532 So. 2d 1239, 1244 (Miss. 1988). This is especially true where the defendant is charged with having hired the victim killed, and the prosecution is proceeding on an accessory-before-the-fact theory. *Id.* The circuit court is limited to the evidence offered at the Rule 104 hearing. *Id.* However, on appeal, this Court will search the entire record to determine whether the preliminary fact of conspiracy has been established. "It is to the entire record that we employ a clearly erroneous standard of review." *Id.*

Based upon the circuit court's standards, prior to Cork's testimony, it was established that the dead body of Jerry Tavares was found on a dirt road close to his convenience store. His body had been shot three times by a .9 millimeter weapon. Evidence showed that Jerry Tavares died as a result of .9 millimeter gunshots. An acquaintance of both Jerry and Ilene Tavares testified that both had stated that they would pay someone to have the other killed. Sheriff Steed testified that Cork told him where the gun and clip were. Steed stated that both the gun and clip were recovered from a stream. Steed testified as to the phone records from the Little Mountain service station to the Tavares's home. Steed also testified as to the location of the body. Finally, Steed stated that the arrests of Tavares, Barnett and Davis were immediately made after the conversation with Cork. Based on the above-mentioned evidence, we find evidence supporting a conspiracy was sufficiently proved prior to Cork's testimony.

Also, based upon our broader standards upon appeal, in the record we find substantial evidence to support the conspiracy to kill Jerry Tavares. We find that the existence of a conspiracy is supported by the following: (1) the location of the bullet wounds in Tavares's body; (2) the location of the body; (3) the evidence of the phone call made from the service station in Little Mountain to Tavares's home; (4) the location of the gun and the clip found in the creek; (5) the $1,500.00 check from J.R.'s Hwy. 12 Mart signed by Tavares made payable to Billy Barnett; (6) the $500.00 check from Glen Davis to Bennie Cork; (7) the cash-in deposit ticket in the amount of $495.00 into the checking account of Glen Davis; (8) the statement by Mark Smith that he had been approached by Barnett to kill Jerry Tavares for money; and (9) the fact that the gun traded to Barnett by Smith was the .9 millimeter used in the murder. We find that the evidence was not clearly erroneous as to the circuit court's finding of the existence of a conspiracy between Tavares, Cork, Barnett and Davis.

Tavares finally argues that Cork's testimony was uncorroborated, untrustworthy, and should have been withheld from the jury. Tavares relies upon *Mason v. State*, 429 So. 2d 569, 571 (Miss. 1983), to make this argument. *Mason* reaffirmed the rule that the uncorroborated testimony of an accomplice may be sufficient to convict the accused, even where the charge is capital murder, but "[s]uch testimony . . . should be viewed with great caution and suspicion and must be reasonable, not improbable, self-contradictory or substantially impeached." *Id.* The rule was recently reviewed and reaffirmed in *Brown v. State*, 682 So. 2d 340 (Miss. 1996). However, "[w]here there is slight corroborative evidence, the accomplice's testimony is likewise sufficient to sustain the verdict." *Brown*, 682 So. 2d at 344-45 (*quoting Mason*, 429 So. 2d at 571).

As stated previously, the testimony of Cork was corroborated by (1) the location of the bullet wounds in Tavares's body; (2) the location of the body; (3) the evidence of the phone call made from the service station in Little Mountain to Tavares's home; (4) the location of the gun and the clip found in the creek; (5) the $1,500.00 check from J.R.'s Hwy. 12 Mart signed by Tavares made payable to Billy Barnett; (6) the $500.00 check from Glen Davis to Bennie Cork; (7) the cash-in deposit ticket in the amount of $495.00 into the checking account of Glen Davis; (8) the statement by Mark Smith that he had been approached by Barnett to kill Jerry Tavares for money; and (9) the fact that the gun traded to Barnett by Smith was the .9 millimeter used in the murder. It can *easily* be stated that Cork's testimony was corroborated by these other events and occurrences.

Further, if their were any doubt, the trial court granted jury instruction 13, which reads:

A person criminally involved with others in a crime is an accomplice. The testimony of an accomplice is to be considered and weighed with great care and caution and suspicion. You may give it such weight and credit as you deem it is entitled.

We feel that the testimony of Cork was not overly untrustworthy, unreasonable or unbelievable as to exclude it from the jury. The granted instruction cautioned the jury to use care, caution and suspicion when weighing Cork's testimony. We can only assume that the jury did as they were told, and we will not disturb their decision.

## IV.

### THE TRIAL COURT ERRED IN IMPOSING AN ILLEGAL SENTENCE OF LIFE WITHOUT PAROLE.

When Suzanne Ilene Tavares committed her offense of capital murder in May of 1992, Miss. Code Ann. §97-3-21 read, in its pertinent parts, as follows: "Every person who shall be convicted of capital murder shall be sentenced to death or to imprisonment for life in the state penitentiary." At the time of her trial in 1995, §97-3-21 had been amended, in its pertinent parts, to read: "Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f)." Miss. Code Ann. §97-3-21 (Revised 1994).

Defense counsel for Tavares had an *ex parte* conference with the judge prior to the granting of sentencing instructions. Specifically noting that defense counsel wanted this conversation on the record, counsel explained to Tavares that he could urge the trial court to do one of two things: (1) submit to the jury the option of either death or life, which would mean perhaps life with the possibility of parole; or (2) submit to the jury the three alternatives of life, life without the possibility of parole, or death. Tavares's counsel explained to her that she had a greater chance of getting a life sentence by choosing the second option instead of the first option. The trial court asked Tavares if she understood what her legal counsel had proposed to her, and she answered, "Yes, sir." The trial judge allowed all three options, life, life without parole, and death, to go to the jury in the form of two instructions for their consideration. The State's position was that the instructions were illegal.

Following the sentencing phase, the jury returned a sentence of "life without parole" on the capital murder charge. Thereafter, the defense filed a motion to amend the judgment which challenged the legality of the sentence. In a post-trial hearing, the trial court denied the motion on the ground that imposition of the sentence did not violate the *ex post facto* clause of the federal or state constitutions. The trial court further held that the defense had waived objection by requesting that life without parole be provided to the jury as a sentencing option.

Tavares argues the trial court erred in sentencing her to life without parole. She asserts that such a sentence rests on a statutory construction in violation of the *ex post facto* clause. Tavares contends that reversal of her sentence should result in a corrected sentence of life imprisonment. The State contends that Tavares cannot "have her cake and eat it too." The State argues that Tavares waived her *ex post facto* claim concerning her sentence.

In *Stevenson v. State*, 674 So. 2d 501 (Miss. 1996),the Mississippi Supreme Court was faced with a similar situation. The defendant entered a guilty plea in 1978 in exchange for the State not seeking the death penalty. *Id.* at 502. Stevenson was sentenced to life imprisonment without the benefit of parole. *Id.* In 1993, Stevenson filed a motion under the Post Conviction Relief Act asking that his sentence be vacated and that he be resentenced. *Id.* at 503. The trial court found that Stevenson's plea was intelligently, understandingly and voluntarily entered into, and that Stevenson understood and appreciated the fact that his sentence was to be without the benefit of parole. *Id.* at 503-04. The supreme court reversed and remanded Stevenson's conviction. *Id.* at 505. The court stated that:

The state can either plea bargain with Stevenson and ask for his waiver of a potential *ex post facto* violation and have life without parole imposed under the new statute, or Stevenson can go to trial with the possibility of receiving either the death penalty or life imprisonment with the possibility of parole, or the state can agree to allow Stevenson to simply plea and have a life sentence with the possibility of parole imposed.

*Id.* at 506.

We read this language in *Stevenson* to mean that an *ex post facto* claim may be waived. This is what occurred in the case *sub judice*. At the time of Tavares's crime, the statute did not provide for life without the possibility of parole. However, at the time of trial, the law did provide for life without the possibility of parole. It was a tactical advantage for the jury to have the possibility of "life without parole" added to the other choices of "life" and "death" when they were sentencing Tavares, and this was a fact known to defense counsel and specifically made known to Tavares herself. On the record, Tavares acknowledged this fact when questioned by the trial judge. Tavares waived her claim of an illegally imposed sentence of "life without parole" at trial.

**THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT ON CHANGE OF VENUE TO THE GRENADA COUNTY CIRCUIT COURT OF MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO ATTALA COUNTY.**

**BRIDGES, C.J., McMILLIN, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.**