# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-02081-SCT

*ALPHA GULF COAST, INC. d/b/a BAYOU CADDY'S JUBILEE CASINO*
*v.*
*CHARLES JACKSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/1999 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | C. YORK CRAIG, JR. |
| | J. CHASE BRYAN |
| | VIKKI J. TAYLOR |
| ATTORNEY FOR APPELLEE: | JOHN H. COX, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 12/13/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/3/2002 |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. On September 30, 1997, Charles Jackson ("Jackson"), sued Alpha Gulf Coast, Inc. d/b/a Bayou Caddy's Jubilee Casino ("Alpha") in the Circuit Court of Washington County, alleging that he was falsely charged, arrested and prosecuted for the crime of disorderly conduct and sought damages. Following discovery and pretrial motions, a jury trial was conducted in the Circuit Court of Washington County, Greenville, Mississippi on September 15 and 16, 1999. At the close of Jackson's case, Alpha moved for a directed verdict. The motion was denied by the trial court. The case was submitted to the jury, and a verdict was returned for Jackson in the amount of $1,000,000.00 in compensatory damages. After the trial on compensatory damages, the trial judge ruled that the issue of punitive damages should not go to the jury for consideration.

¶2. On September 30, 1999, Alpha filed a Motion for Judgment Notwithstanding the Verdict or Alternatively a New Trial. On November 21, 1999, the trial court granted the motion for a new trial unless Jackson accepted a remittitur of $500,000.00. On December 6, 1999, Jackson accepted the remittitur of $500,000.00. From the judgment entered on the jury verdict and subsequent remittitur, Alpha appeals and Jackson cross-appeals.

## STATEMENT OF ISSUES

**1. Did the Court err in failing to grant Alpha's Motion for Directed Verdict and/or Motion for Judgment notwithstanding the verdict?**

**2. Was the jury's verdict on the issue of damages against the overwhelming weight of the evidence?**

**3. Did the Court err in failing to grant Alpha's Motion for New Trial on Damages without a remittitur?**

**4. Did the Court err in failing to grant a larger remittitur?**

**5. Was the Plaintiff's closing argument inflammatory?**

**6. Did the trial court err in allowing Jackson to testify that he would have to report his arrest to the United States Army in future security clearance applications?**

**7. Did the trial court err in allowing Jackson to introduce evidence of his evaluations as an Army officer into evidence?**

**8. Did the trial court err in refusing to grant Alpha's Motion for Leave to Question the Jurors?**

## Cross-appeal statement of issues

**1. The trial court erred in failing to grant Plaintiff's Jury Instruction Number P-10, Subsection (7) requesting damages for mental anguish and emotional trauma caused by the arrest and prosecution of the Plaintiff.**

**2. The trial court erred in failing to allow Plaintiff to present evidence concerning the wrongful conduct of the Defendant in relationship to punitive damages and in failing to grant Plaintiff's Jury Instructions P- 11, P-12, and P-13.**

**3. The Trial Court erred in failing to allow the Plaintiff to introduce evidence of existence of a video tape of the blackjack table (surveillance daily log sheets) and in failing to grant Plaintiff's Jury Instruction P-5.**

**4. The Court erred in reducing the verdict of the Jury by Order of Remittitur in the sum of $500,000.00.**

## FACTS

¶3. Paul Andrzejeweski (Andrzejeweski), an employee for Jubilee Casino and adverse witness, was called as Jackson's first witness. On the night of November 29, 1996, Andrzejeweski was working as a dealer for the casino. Jackson was sitting at the blackjack table that Andrzejeweski was working on his 7:00 p.m. to 3:00 a.m. shift. Andrzejeweski testified that there are cameras that are pointed at the tables, but he never saw a tape that depicted the event in question. Not being employed by the surveillance section, Andrzejeweski stated that he thought the camera recorded the games to see if there were any problems

such as thefts by an employee or patron and to record incidents such as unruly patrons. He stated that Jackson appeared to know how to play blackjack. Also, he did not remember Jackson drinking anything that night, although the casino was busy. Jackson was the last player at the blackjack table.

¶4. Andrzejeweski testified that Jackson indicated by a hand signal that he did not want another "hit" (another card), so he dealt himself a card. At this point, Jackson complained that he had wanted another "hit" (another card), and Andrzejeweski called John Foley (Foley) to the table. Foley told Jackson that they could not back up the cards, but he could have the next card. Jackson took the next card, won the game and then went into a "rage" and began cursing. Foley was called to the table again and he asked Jackson to leave the casino. The whole incident was about 10-12 minutes and then Jackson left the blackjack table. Andrzejeweski testified that he could not remember whether Jackson left the table of his own accord or if he was escorted away from the table by security. On direct examination, Andrzejeweski testified Jackson was creating a disturbance and getting loud. As Jackson left the table a chair fell, however, he did not know if it was an accident or if it was done in anger.

¶5. Next a videotape of the main cage area was shown to the jury.

¶6. Willard McIlwain testified that he was present at the Jubilee Casino on November 30, 1996, and in the videotape that the jury viewed. He was at the cashier's cage and about one to two feet away from Jackson in the videotape. Nothing out of the ordinary occurred, no loud talking or commotion. The first time that McIlwain noticed anything was when the security guards surrounded Jackson. While McIlwain did not watch every second of the incident, he did not hear Jackson speaking loudly or say any curse words. He did not see the initial contact with the security guards, but he did see Jackson bent over the counter, the men were pushing Jackson, and his hands were behind his back. On cross-examination, McIlwain stated that he did not hear any of the substance of the conversation between Jackson and the casino employees, although he did not hear any screaming or profanity. Also, he was at varying distances of less than one foot to about four to five feet from Jackson over the course of the video footage.

¶7. The deposition of Bruce Sweeden (Officer Sweeden), a Greenville policeman, was read into the record. Officer Sweeden responded to a call from the Greenville Police Department and went to Jubilee Casino because they had someone in custody for creating a disturbance. When Officer Sweeden arrived downstairs at the casino, there were about four or five casino employees and Jackson was in handcuffs.

¶8. Gaines Dyer, attorney for Jackson at the Municipal Court for the disorderly conduct trial, testified that the case was dismissed with prejudice without any testimony from either party. He never received any calls from Alpha to reset the trial. The city court judge and clerk never requested that he return to court to try the case.

¶9. Mike Boyd (Judge Boyd), Assistant City Court Judge of Greenville, testified that he suspended the case until the casino employee returned to court with the videotape. The casino employee did not return to court on February 10, 1999, and therefore, the judge dismissed the case for lack of prosecution. Judge Boyd testified that to his knowledge no casino personnel contacted him to reschedule the case, to protest the dismissal, or to show him the videotape.

¶10. Jackson testified that on the date of trial he was a Captain in the United States Army. He considers himself in line for promotions and plans to make the military his career. All military officers are required to have security clearance. Jackson has had a security clearance since 1986. Jackson identified four

documents: his initial security clearance application; an updated security clearance blank form (Form DD 398-2); the Uniform Code of Military Justice, Article 133 pertaining to Conduct unbecoming as an Officer and a Gentleman; and some of his evaluation reports.

¶11. Jackson testified that he went to the casino and played at the same blackjack table all night. Also, he stated that the black jack dealer was not Andrzejeweski, but a black female dealer. Jackson testified that he indicated in the downstairs security area that the dealer was female. Jackson, then, stated that the dealer made a mistake in dealing the cards and had skipped one of the ladies at the table. His hand was bad and he wanted to withdraw, however, the pit boss came to the table and said that the hand would have to be played. A woman sitting beside Jackson stated that earlier in the evening, a patron was allowed to withdraw their money. Jackson lost this hand and placed a bet for another game when the pit boss came back to Jackson about three times. Jackson stated that he told the pit boss that the casino had made their decision, he was not complaining. As he began to play the next game, the pit boss apparently told Jackson that they would throw him out of the casino. Jackson stated that they would not throw him out because if he took a chip off the table, he would take his money and leave. The pit boss told Jackson to not touch the chip, Jackson did not touch it. He won the game and picked up his money and pushed back his chair. The chair fell, and Jackson picked up the chair. As Jackson was leaving the blackjack table, he spoke to a security guard and told the guard that he wanted to make a complaint. Jackson went to the cashier's line to get his money and make a complaint. Jackson stated he never used profanity, drank any alcohol or addressed anyone "out of line," rather he said sir and ma'am to the people at the casino.

¶12. Prior to standing in line at the cashier, no one told Jackson to leave and no security guards came to the blackjack table. He left the blackjack table on his own accord because he felt insulted and did not want to stay at the casino. As Jackson was standing in line, a security guard walked over to him and told him to cash in his chips and leave. The second time that the guard told him to cash his chips and leave, Jackson told the guard that his intent was to cash in the chips and to make a complaint. The guard continued, and Jackson turned around because he felt people were looking and he did not want any unnecessary attention. The guard moved to the right side of Jackson and tugged on Jackson's arm while he was standing in line. Jackson told the guard to let go of his arm and the guard continued. Jackson did not pull his arm away from the guard.

¶13. As the people in line finished at the cashier's desk, Jackson moved up to the window, and the guard told him to cash in his chips and leave. When Jackson was at the cashier's counter, he asked to make a complaint, and an employee had another employee come to the window. Jackson asked the employee to ask the guard to let go of his arm. The employee asked the guard to let go of his arm, but the guard did not respond. Jackson testified that he put his chips on the counter and put his hands at his side. At this point, the guards grabbed him, pushed him over the counter, put his arms behind his back and handcuffed him. The guards twisted his arms which made his shoulders sore. As the guards took Jackson downstairs to the security room, he told the guard that he did not need this and it would cause him problems. He continued to discuss the situation with the guard to see if he could reverse their decision. Jackson was arrested and taken to the Greenville Police Department where he continued to plead his case.

¶14. At the station, the police charged Jackson with disorderly conduct under Miss. Code Ann. § 97-35-3(1). Jackson posted a $125.00 bond, and then went to his mother's house in Sunflower County. He testified that he told his mother about the arrest. At the time of the arrest, Jackson was on military leave from Fort Hood, Texas, and he had to get his leave extended in order to go to court. Jackson, also, had to

contact his sister and brother-in-law in Fort Hood, when he was unable to contact his supervisor and request extended leave time. Jackson testified that he was very embarrassed about having to report the arrest to his sister and her husband.

¶15. Jackson hired Dyer to represent him in court, and he went back to Fort Hood. During the time between November 30, 1996, and his trial date of February 10, 1997, Jackson was worried that the military might find out about the arrest. If the military found out about the arrest, then Jackson could be charged with conduct unbecoming of an officer, whether he was ultimately convicted of the misdemeanor or not. In order to prepare for the trial, Jackson returned home, asked five people to testify on his behalf at trial, and told them the details of his arrest. Jackson testified that he was embarrassed at having to tell the five people, four of which were former subordinates of his at the Army Reserve Center in Greenville.

¶16. On the day of the trial, February 10, 1997, Jackson and his five witnesses waited in the court room for a casino representative to return with the videotape of the incident. The casino representative never returned, and the judge dismissed the case. Within the next two years, Jackson has to submit a renewal for his security application. Part of the application includes listing all arrests regardless of the outcome of the case. Jackson testified that even though the trial was over and his record had been expunged, he was embarrassed by the incident. In particular, Jackson was embarrassed about being escorted out of the casino in handcuffs, having to tell his mother and family, and having to tell the soldiers he commanded and to ask for their help at trial. He also stated that he felt his reputation had been damaged as an officer in the United States Army, as a male in his family, as a male in the United States and as a black male in his community.

¶17. On cross-examination, Jackson stated that he never used profanity at the casino. In addition, Jackson stated that he was upset because the pit boss continued to approach him and tell him that he (pit boss) would throw Jackson out of the casino, after the pit boss made a decision on the withdrawal of his blackjack hand. Basically, Jackson felt that the pit boss was telling him that he did not think much of Jackson as a customer. Since Jackson was betting between $25-$100 a hand, he found the pit boss's actions to be offensive and insulting. Jackson denied wanting and any special treatment because he was in the military or because he was spending $25-$100 a hand. He did not give the casino his name to be rated and he wanted to be left alone. Jackson did feel harassed because the pit boss kept coming back to his table and speaking to him after the pit boss made the decision about the game to which Jackson never responded.

¶18. Jackson testified that four different pit bosses spoke to him. The first pit boss asked him if he wanted to be rated; the second pit boss came when Jackson wanted to withdraw from the game; Jackson did not remember what the third boss said to him, but Jackson told him that the casino made their decision and to leave him alone and there was nothing more to say; and the fourth pit boss said that these are the rules if you don't like them then we'll throw you out, to which Jackson responded that he could take his money and leave. Jackson did not know why the pit bosses kept speaking to him. When he decided to leave he knocked his chair over, picked it up, and headed toward the cashier's window. At this point Jackson spoke to a security guard and asked the guard where he could make a formal complaint and cash his chips.

¶19. Following Jackson's case-in-chief, the trial court had a hearing on Alpha's Motion for Directed Verdict. After hearing arguments from both sides, the trial judge denied the Motion for Directed Verdict.

¶20. Alpha called Anthony Akins (Akins), the security supervisor at the casino, to the stand. Akins observed Eric Sutton (Sutton) and Jackson as they stood in line at the cage. Akins stated that Sutton asked

Jackson to cash in his chips and leave. He heard Jackson ask Sutton to whom he could make a complaint. Sutton told Jackson that the person to make a complaint was the general manager and he would be working on Monday morning and that the supervisor of the cage could not help Jackson. At this point, Akins stated Jackson began to get loud, things were getting out of hand, and there was finger pointing and touching. Akins then told another security guard, Dewayne Kingdom (Kingdom), to put restraints on Jackson and that he would be charged with disorderly conduct. He stated that other patrons were stopping, looking, and pointing. The casino will restrain anyone who they are going to charge, and Jackson was treated no differently than any other patron.

¶21. On cross-examination, Akins stated that Jackson did not touch Sutton, but Sutton put his hands on Jackson's arm.

¶22. Sutton, a security guard at the casino, was called as a witness. Foley, the casino manager, told Sutton that he had a problem with Jackson at the blackjack table, Jackson used profanity toward the dealer and himself. Foley told Sutton to ask Jackson to leave the casino. Jackson was already walking toward the cage when Foley told Sutton to tell Jackson to leave the casino. Sutton testified that he asked Jackson to leave at least five times, but Jackson did not cash in his chips and placed his hands over the chips. Sutton stated that at one point he put his arm on Jackson to try to pull him away and get Jackson to leave the casino. Jackson wanted to make a complaint that night and Sutton told him who he should speak to concerning the matter. Sutton continued to speak to Jackson and asked him to leave. Then, Kingdom and Akins approached them and restrained Jackson.

¶23. Jackson was taken downstairs to the security office, and the casino contacted the Greenville Police Department. Sutton then went to the police department and explained the situation to the clerk. The clerk typed an affidavit which Sutton signed. Sutton did not know what statute to use for the situation.

¶24. On the day of the municipal court proceeding, Sutton was subpoenaed to be at court. At court the judge asked for the videotape. Sutton left court to get the tape. The casino could not get the tape at that time and Sutton returned to court, but the case had been dismissed. Dewayne Kingdom had been at court and told Sutton that the trial was dismissed.

¶25. On cross-examination Sutton stated that there are video cameras to record table games. He admitted that his testimony in his deposition that he approached Jackson on the floor, not as Jackson was walking to the cage, was correct. Sutton testified that Jackson never cursed, and he did not think Jackson had been drinking. Sutton read from his deposition which stated that he did not know whether Jackson was doing anything unlawful while standing in line at the cage. Sutton stated that he did not feel that Jackson should have been handcuffed because he did not want him to be arrested. The clerk typed exactly what Sutton told her, and he read and signed the affidavit. On the day of trial, Kingdom was in court on another case.

## LEGAL ANALYSIS

### 1. Did the Court err in failing to grant Alpha's Motion for Directed Verdict and/or Motion for Judgment notwithstanding the verdict?

¶26. Alpha contends that based on undisputed evidence, the two liability issues of false imprisonment and malicious prosecution fail and it is entitled to a judgment as a matter of law. This Court finds the contention to be without merit.

¶27. The standard of review for a denial of a directed verdict and a motion for a judgment notwithstanding the verdict is the same.

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law. *Id.* (citing *Sperry-New Holland v. Prestage*, 671 So.2d 248, 252 (Miss. 1993)); *American Fire Protection, Inc. v. Lewis*, 653 So.2d 1387, 1390-91 (Miss. 1995); *Misso v. Oliver*, 666 So.2d 1366, 1375-76 (Miss. 1996).

*Steele v. Inn of Vicksburg, Inc.*, 697 So.2d 373, 376 (Miss. 1997). When there is conflicting testimony, the jury determines the weight and worth of the witnesses' testimony and credibility at trial. *Wallace v. Thornton*, 672 So.2d 724, 727 (Miss. 1996). A reversal of a jury verdict is not warranted unless it is against the overwhelming weight of the evidence and credible testimony. *Id.*

### A. False imprisonment

¶28. The tort of false imprisonment has two elements which are (1) the detention of the plaintiff; and (2) the unlawfulness of such detention. *Wallace v. Thornton*, 672 So. 2d at 727; *Thornhill v. Wilson*, 504 So.2d 1205, 1208 (Miss. 1987). The second element concerning the unlawfulness of the detention, is determined by evaluating whether, "looking at the totality of the circumstances, the actions of the Defendant were objectively reasonable in their nature, purpose, extent and duration." *Wallace*, 672 So.2d at 727.

¶29. In the case sub judice, the trial court denied Alpha's motion for summary judgment in the pre-trial hearings; denied the motion for directed verdict; and denied the motion for JNOV for both the false imprisonment and malicious prosecution allegations. The trial judge determined that there were sufficient issues of fact in dispute and that the questions of fact should be resolved by a jury.

¶30. In regard to the false imprisonment claim, Jackson was clearly detained by the casino employees. While standing at the casino's main cage, Alpha's security personnel forcibly pushed Jackson over the counter, placed his arms behind his back, and handcuffed him. Casino personnel then led Jackson to the security office located on the lower floor of the building and detained him until the Greenville Police Department arrived at the office. As to the second element, the record indicates that testimony from Jackson and his witnesses versus Alpha employees differ as to the events that prompted the detention of Jackson at the casino in the night in question. In addition, the videotape of the main cage area had visual but no audio capabilities. Both litigants have differing views as to what the actions of the witnesses on the videotape signify. Therefore, the question was properly posed to the jury.

¶31. In this instance, the jury considered the evidence and credible testimony and found for Jackson. The jury had the opportunity to weigh the conflicting testimony and found that there was substantial evidence in support of the verdict and that the evidence was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment reached the conclusion that Alpha was liable for false imprisonment.

## B. Malicious prosecution

¶32. This Court held that the six elements of malicious prosecution are as follows:

> (1) [t]he institution or continuation of original judicial proceedings, either criminal or civil;

> (2) by, or at the instance of the defendants;

> (3) the termination of such proceeding in plaintiff's favor;

> (4) malice in instituting the proceedings;

> (5) want of probable cause for the proceedings; and

> (6) the suffering of damages as a result of the action or prosecution complained of.

*Woolfolk v. Tucker*, 485 So.2d 1039, 1043 (Miss. 1986). *C & C Trucking Co. v. Smith*, 612 So. 2d 1092, 1099-1100 (Miss. 1992); *Accord*, *Royal Oil Co. v. Wells*, 500 So. 2d 439, 442 (Miss. 1987);.

¶33. The facts for the first three elements of malicious prosecution are relatively straight forward. Jackson was charged with disorderly conduct by Alpha, via an employee, Sutton. On February 10, 1999, Judge Boyd, dismissed the charge against Jackson for lack of prosecution. Both Judge Boyd and Dyer, attorney for Jackson at the disorderly conduct trial, testified that to their knowledge neither of them were contacted by the casino to reschedule a court date.

¶34. Alpha focuses its argument on the remaining elements of malicious prosecution. As to the element of malice in instituting the proceedings, this Court has defined malice in malicious prosecution cases to be a term that is used in an artificial and legal sense signifying that the prosecution was commenced primarily for a purpose other than that of bringing the accused to justice. *C & C Trucking Co. v. Smith*, 612 So. 2d at 1100; *Royal Oil Co. v. Wells*, 500 So. 2d at 444; *Woolfolk*, 485 So.2d at 1043. Most often, malice is proved by circumstantial evidence. *Royal Oil Co.* 500 So.2d at 444.

¶35. The record contains points to ample testimony that would have enabled the jury to find malice in the actions by the casino. Blackjack dealer Andrzejewski testified that Jackson complained of a mistake in the dealing of the blackjack cards, which prompted Andrzejewski to summon the pit boss, Foley, to the table to address the issue. Once the issue was resolved, Andrzejewski testified that Jackson *won* the game and then went into a "rage" and began cursing. Foley was called to the table, and he asked Jackson to leave the casino. Jackson, on the other hand, testified that a pit boss came to the table approximately four times. Jackson told the pit boss that the casino had made its decision, and he was not complaining. A pit boss returned to Jackson's table and told him that they would throw him out of the casino. Jackson responded that he would take his money and leave and after winning the game he left the table. Prior to standing in line for the main cage, Jackson testified that he left on his own accord, no one told him to leave and he never used any profanity. There was conflicting testimony from both litigants' witnesses as to whether Jackson was making a disturbance in the casino.

¶36. Sutton testified that Foley, the casino manager, told him that there had been a problem with Jackson at the blackjack table; Jackson used profanity and Foley asked Sutton to ask Jackson to leave the casino. On cross-examination, Sutton testified that Jackson never used profanity in his presence. Jackson's counsel

focused on conflicting testimony as stated by Sutton on the day of trial versus his 1998 deposition. Sutton read a portion of his deposition of 1998 into the record. During the deposition, he stated that he did not know whether Jackson was doing anything unlawful while standing in line at the cage. Sutton testified that he did not feel Jackson should have been handcuffed because he did not want Jackson to be arrested and he wanted to talk Jackson out of the casino without having an arrest. However, Sutton went to the police station and read and signed an affidavit against Jackson.

¶37. As to the element of probable cause in a criminal case, the person initiating the prosecution must have both "(1) an honest belief on the guilt of the person accused, and (2) reasonable grounds for such belief." *Woolfolk*, 485 So.2d at 1043 (citing *Harvill v. Tabor*, 240 Miss. 750, 128 So.2d 863, 865 (1961)); *C & C Trucking Co. v. Smith*, 612 So. 2d at 1100. As stated above, Sutton's deposition answer indicated that he did not know whether Jackson was doing anything unlawful while standing in line at the cage. Sutton further testified in his deposition that he felt the handcuffs were unjustified. On the day of trial, Sutton stated that he still agreed with that deposition, because he did not want to see Jackson arrested. If Sutton did not believe that Jackson had done anything unlawful while in line, then he could not have had reasonable grounds for such a belief of guilt on the part of Jackson. In the very least, Sutton's own conflicting testimony coupled with the testimony of all other witnesses at trial, would have been a question for the jury to resolve. As to the last element, damages, there was testimony that Jackson suffered damages, including but not limited to, embarrassment and harm to his reputation.

¶38. The jury considered the evidence and credible testimony and found for Jackson. The jury had the opportunity to weigh the evidence and conflicting testimony and found that there was substantial evidence in support of the verdict and that the evidence was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment reached the conclusion that Alpha was liable for malicious prosecution. This issue is without merit.

### 2. Was the jury's verdict on the issue of damages against the overwhelming weight of the evidence?

¶39. Alpha contends that the actual damages of $1,000,000.00 was against the overwhelming weight of the evidence and requests a new trial. In the statement of the issues Alpha lists issues 2-4 separately; however, in the body of the brief, the issues are combined. For clarity, the issues will be addressed separately by this Court. This Court finds this contention to be without merit in light of the remittitur.

¶40. The standard of review for an assertion that the jury's verdict is against the overwhelming weight of evidence and merits a new trial is cited in *Grant v. Green*, 641 So.2d 1203, 1207-08 (Miss. 1994) (citing *Anchor Coatings, Inc, v. Marine Indus. Residential Insulation, Inc.*, 490 So.2d 1210, 1215 (Miss. 1989)).

> The grant or denial of a motion for new trial is and always has been a matter largely within the sound discretion of the trial judge. The credible evidence must be viewed in the light most favorable to the non-moving party. The credible evidence supporting the claims or defenses of the non-moving party should generally be taken as true. When the evidence is so viewed, the motion should be granted only when upon a review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice. Our authority to reverse is limited to those cases wherein the trial judge has abused his discretion.

¶41. The specific jury instruction pertaining to damages cited by Alpha is as follows:**JURY INSTRUCTION P-10**

> That (sic) Court instructs the Jury that in the event that you should return a verdict for the Plaintiff, just and fair compensation for his injury is a decision to be made by the jury. Your discretion as to the measure of damages is wide, but not unlimited, and you may not act arbitrarily. Exercise your discretion in your award of damages reasonably, intelligently and in harmony with the evidence of the case and the court's instructions. The damages for personal injury can not be assessed by any fixed rule, but you are the sole judges as to the measure of damages in this case. You may consider the following factors in determining what amount of damages, if any, to award as may be shown by a preponderance of evidence:

> 1. Embarrassment and humiliation if any of the Plaintiff as a result of a false arrest and/or malicious prosecution before the public, his family and friends;

> 2. Assault if any upon his person by Defendant's employees;

> 3. The cost of paying a bail bond in the amount of $125.00;

> 4. Attorneys fees in the amount of $750.00 incurred in defending the action before the Municipal Court of the City of Greenville;

> 5. Embarrassment, humiliation and injury, if any, to his reputation which the record of arrest will cause the Plaintiff to suffer with associates;

¶42. The credible evidence is viewed in the light most favorable to Jackson, the non-moving party, and the damages have to be proven by a preponderance of the evidence. Of the five factors enumerated in the jury instruction, the bond and attorney's fees are explicitly assessed. Therefore, the alleged damages in dispute relate to the (1) embarrassment and humiliation resulting from a false arrest and/or malicious prosecution before the public, his family and friends; (2) embarrassment, humiliation and injury to his reputation which the record of arrest will cause Jackson to suffer with associates; and (3) any damages resulting from the assault by Alpha's employees. At trial, Jackson and other witnesses testified to the three remaining factors.

¶43. Jackson stated that he had never been arrested prior to these events. He was embarrassed at having to tell his mother, sister and brother-in-law about the arrest. At the time of the arrest he was on military leave and could not contact his supervisor to get a leave extension. Jackson contacted his sister and brother-in-law, who were stationed at the same base in Texas, to ask them to assist him in contacting his superior.

¶44. During the time between November 30, 1996, and his trial date of February 10, 1997, Jackson was worried that the military might find out about the arrest. If the military found out about the arrest then Jackson could be charged with conduct unbecoming of an officer, regardless of whether he was ultimately convicted of the misdemeanor. To prepare for the trial, Jackson returned home and asked five people to testify on his behalf at trial, and told them the details of his arrest. Jackson testified that he was embarrassed at having to tell the five people, four of whom were former subordinates of his at the Army Reserve Center in Greenville.

¶45. Within the next two years, Jackson testified that he has to submit a renewal for his security application.

Part of the application includes listing all arrests regardless of the outcome of the case. Jackson testified that even though the trial was over and his record had been expunged, he was embarrassed by the incident. In particular, Jackson was embarrassed about being escorted out of the casino in handcuffs, having to tell his mother and family, and having to tell the soldiers he commanded and ask for their help at trial. He also stated that he felt his reputation had been damaged as an officer in the United States Army, as a male in his family, as a male in the United States and as a black male in his community.

¶46. As to the assault, Jackson testified that he was approached by casino employees and grabbed, pushed over the main cage counter, put his arms behind his back and handcuffed him. The guards twisted his arms in the process of restraining him. McIlwain largely substantiated Jackson's testimony.

¶47. Viewing the credible evidence in the light most favorable to Jackson, the non-moving party, and that damages have to be proven by a preponderance of the evidence, the testimony supports the finding that there is sufficient evidence to justify damages in this case. This issue is without merit.

### 3. Did the Court err in failing to grant Alpha's Motion for New Trial on Damages without a remittitur?

¶48. Alpha contends that the trial court erred in failing to grant a new trial on damages without a remittitur. A motion for new trial is a challenge to the weight of the evidence. This contention pertaining to the weight of the evidence is addressed in the analysis of the previous issue. This Court finds no merit to the previous contention that the jury's verdict on the issue of damages was against the overwhelming weight of the evidence in light of the remittitur, as such, this Court finds that this issue is, also, without merit for the above cited reasons.

### 4. Did the Court err in failing to grant a larger remittitur?

¶49. Alpha contends that the trial court erred in failing to grant a larger remittitur. However, Alpha's brief appears to request relief in the form of a new trial, stating that an "outrageous" verdict cannot be cured by remittitur. In his cross-appeal brief, Jackson contends that the trial court erred by reducing the verdict of the jury to $500,000.00.

¶50. The standard of review to determine whether a jury verdict is excessive in a particular case is as follows:

> The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the Jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, where they have no standard by which to ascertain the excess.

*Wells Fargo Armored Serv. Corp. v. Turner*, 543 So. 2d 154, 158 (Miss. 1989)(citing *Detroit Marine Eng'g v. McRee*, 510 So.2d 462 (Miss. 1987)). However, this Court has held that a jury verdict cannot be disturbed simply because the amount of damages seems to be either "too high" or "too low." *C & C Trucking Co. v. Smith*, 612 So.2d at 1106.

¶51. In malicious prosecution cases in particular, a person is entitled to recover damages for harm to his reputation as a result of criminal proceedings against him and for mental anguish and distress causally resulting from the criminal proceedings. *Junior Food Stores, Inc. v. Rice*, 671 So.2d 67, 76 (Miss.

1996). However, this Court recognized that there is difficulty in quantifying monetary awards in cases involving malicious prosecution claims. *Id.* at 77; *C & C Trucking*, 612 So.2d at 1106.

¶52. Alpha relies in part on *Woolfolk v. Tucker,* 485 So.2d 1039 (Miss. 1986), which is a case that deals with a malicious prosecution claim. However, the facts of the case sub judice are far more egregious than those outlined in *Woolfolk*. In *Woolfolk*, Tucker contracted to do electrical work for Woolfolk. *Id*. A dispute arose as to payment for additional work performed by Tucker. *Id*. Subsequently, an argument ensued and a warrant was issued for Tucker's arrest for disorderly conduct. *Id*. However, Tucker was never taken into physical custody, and did not have to make bail. *Id*. The only witnesses to the incident that prompted the warrant for disorderly conduct were Tucker and Woolfolk. *Id*.

¶53. In Jackson's case we have the unusual benefit of having a videotaped account of the events that transpired. Therefore, this Court did not have to rely solely on the cold testimony of the witnesses at trial, rather the videotape provided true insight into the sequence of events that Jackson endured at the casino. The videotape speaks volumes in the case before us today. The video illustrated Jackson being surrounded by security guards, handcuffed and escorted out of the crowded casino to the holding cell. The videotape also shows Jackson's demeanor and his verbal interaction with casino employees while in the holding area. Later, the videotape shows Jackson, again, being escorted out of the crowded casino to be taken to the police station.

¶54. The record also reflects testimony as to damages. Jackson stated the he was embarrassed at having to tell his mother, sister and brother-in-law about the arrest. During the time between November 30, 1996, and his trial date of February 10, 1997, Jackson was worried that the military might find out about the arrest and that he would possibly be charged with conduct unbecoming of an officer and a gentleman. Jackson testified that he was embarrassed at having to tell the five people, four of which were former subordinates of his at the Army Reserve Center in Greenville. Within the next two years, Jackson has to submit a renewal for his security application. Part of the application includes listing all arrests regardless of the outcome of the case. Even though the trial was over and his record had been expunged, he was embarrassed by the incident. In particular, Jackson was embarrassed about being escorted out of the casino in handcuffs, having to tell his mother and family, and having to tell the soldiers he commanded and ask for their help at trial. He also stated that he felt his reputation had been damaged as an officer in the United States Army, as a male in his family, as a male in the United States and as a black male in his community. Additionally, casino employees grabbed Jackson, pushed him over the main cage counter, placed his arms behind his back and handcuffed him. The guards twisted his arms in the process of restraining him. There were no acts by Jackson to justify this behavior. The videotape clearly proves this.

¶55. The lasting effects of an arrest can be devastating. Regardless of whether an arrest has been expunged, a person still must deal with an arrest. This Court has recognized that job applications commonly ask about arrests and the reason for the arrest. *Junior Food Stores, Inc. v. Rice*, 671 So.2d at 76. Similarly, these same types of questions appear on government forms or applications and frequently have a caveat that false information may be grounds for dismissal. Without diminishing the effect of an arrest, this Court finds that the evidence supports that the circuit court was within its discretion in granting a remittitur of $500,000.00 and Jackson is adequately compensated for his actual damages. The trial court found that there was a jury question as to liability and a new trial was not warranted if the remittitur was accepted by the plaintiff. The trial court considered facts pertinent to the elements the jury was instructed to consider for damages. Jackson had approximately $125.00 in bond fees; $750.00 in attorney's fees for representation for the

disorderly conduct charge; and the jury instructions additionally allowed recovery for embarrassment and humiliation for false arrest and/or malicious prosecution; assault; and embarrassment, humiliation and injury to reputation. Therefore, the remittitur of the $1,000,000.00 jury verdict to $500,000.00 should be affirmed.

### 5. Was the Plaintiff's closing argument inflammatory?

¶56. Alpha contends that Jackson's counsel made three inflammatory remarks during closing arguments that were improper, prejudicial, and constitute grounds for a new trial. The three remarks pertain to (1) a video; (2) ability to pay a judgment; and (3) a "send a message" comment. This Court finds that none of the three remarks amounted to reversible error.

¶57. The three statements made by Jackson's counsel during closing arguments are as follows:

#### A. Video

But [Paul Andrzejewski] said that, yes, the video films were running on the black jack tables, and we know that that was certainly the case with respect to what you are about to see. Now, of course, **if we had the videotape, we wouldn't have to be worried about what Mr. Andrzejeweski said or what Mr. Foley said.**

(emphasis added).

#### B. Ability to Pay

We sued this casino for one million dollars, and let me tell you something. That's a lot of money. That's more money than you and I will ever see. That is pocket change to those guys. Pocket change. I'm going to tell you what you ought to reward him. I'll break it down. They want it broken down. The embarrassment, humiliation of Jackson by the arrest before his family, the public and the friends and the malicious prosecution, $450,000 and not a penny less. **They've got it. They should pay it.** They did it to him.

(emphasis added).

#### C. Send a Message

¶58. Jackson's counsel spoke about the damage Jackson sustained as a result of the alleged false imprisonment and malicious prosecution claims and stated:

So how much is it worth? You're the judges of that. But I think it is time, based on what we've seen here today and heard here today, **to send a message to this casino that we in Greenville, Mississippi, are not going to let casinos destroy people's lives, run over them, throw them in jail and prosecute them without cause, and that's why this case is worth one million dollars, and that's what I'm asking for**, ladies and gentlemen.

(emphasis added).

¶59. Attorneys are allowed wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998); *Wilcher v. State*, 697 So.2d 1087, 1010 (Miss. 1997). In addition, the "court should also be very

careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to [a] jury." *Ahmad v. State*, 603 So.2d 843, 846 (Miss. 1992). Any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration. *Id.* The trial judge is in the best a position to determine if an alleged objectionable remark has a prejudicial effect. *Roundtree v. State*, 568 So.2d 1173, 1177 (Miss. 1990).

¶60. In the case sub judice, Alpha objected at trial to the video statement. The trial court sustained the objection. As to the ability to pay statement and the send a message statement, Alpha did not contemporaneously object at trial. This Court held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994)). The contemporaneous objection rule is in place to enable the court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So.2d 1304, 1312 (Miss. 1986) (citing *Baker v. State* 327 So.2d 288, 292-93 (Miss. 1976)). However, Alpha relying on *Johnson v. Fargo*, 604 So.2d 306, 311 (Miss. 1992), maintains that this Court may review the closing comments and determine whether a new trial is warranted, despite no objection at trial, under the plain error doctrine. This Court has the right to notice plain error as cited in M.R.E. 103(d). In *Johnson* this Court held that under the standard of review, the court retains the inherent authority to notice error to prevent the manifest miscarriage of justice, despite trial counsel's failure to preserve the error. *Id*. (citing *State Highway Comm'n v. McDonald's Corp.*, 509 So.2d 856, 863 (Miss. 1987)). In order to reverse under the plain error doctrine, the reviewing court must find both error and harm. *Riggs v. State*, 744 So.2d 365, 372 (Miss. 1999); *Dobbins v. State*, 766 So.2d 29, 31 (Miss. Ct. App. 2000).

¶61. The defense objected to Jackson's video comment at trial. Counsel objected on the basis that the video was a matter not in evidence. The trial judge sustained the objection. If sustaining the objection alone is considered to be inadequate to remove the alleged prejudicial effect of the objected matter from the minds of the jury, then the court must be requested to instruct the jury to disregard the matter. *Anderson v. Jaeger*, 317 So.2d 902, 906 (Miss. 1975). The jury is presumed to understand that the court disapproves of any testimony when an objection is sustained. *Estes v. State*, 533 So.2d 437, 439 (Miss. 1988). Alpha objected to the comment, and the trial court sustained the objection. If Alpha did not consider the sustained objection to be adequate, then the trial court should have been requested to instruct the jury to disregard the matter, otherwise there is no error. *General Motors Corp. v. Pegues*, 738 So.2d746, 754 (Miss. 1998). Alpha did not request the trial court to instruct the jury to disregard the statement.

¶62. Considering the context of the comment, Andrzejewski and Sutton testified that the casino usually videotapes all areas of the casino, including the blackjack table. Jackson showed the videotape of the main cage area to the jury shortly after this comment. The comment did not state that the casino was withholding a videotape of the blackjack table, rather it suggested that a videotape would negate the need to rely on testimony. Based on the above case law, the trial judge was within her discretion. The sustained objection and the presumption that the jury understands that the court disapproves of a sustained comment cured any prejudicial error.

¶63. Alpha contends that the ability to pay comment prejudiced its case to the extent of having a "run away" jury. In effect, Alpha contends that the "they've got it" and "they should pay it" comments indicated that Alpha had the ability to pay a large judgment. Alpha cites the trial court's previous ruling to exclude evidence of the financial status of Alpha and case law pertaining to facts not in evidence. The case sub judice is clearly barred for failure to contemporaneously object to the comment at trial. *Walker*, 671 So.2d

at 597.

¶64. Procedural bar aside, the comment additionally fails under the plain error doctrine and is distinguishable from **Johnson**. In **Johnson**, the plaintiff mistakenly testified to a crime that he did not commit. The plaintiff's counsel was shocked, and the trial court was in turmoil. Yet, the plaintiff kept rapidly answering questions. Here, there were no similar shocking statements made in rapid succession by plaintiff's counsel in closing argument. The defense had already interrupted Jackson's counsel for an earlier closing comment and the judge made a ruling. An objection could have been made by defense counsel concerning the comment and the judge could have ruled on the objection.

¶65. Taking the comment in context, Jackson's counsel was giving the jury an overview and breakdown of the damages in the case. Specifically, the jury should award $450,000.00 for the arrest and malicious prosecution claim. Jackson did not state the net worth of the casino but merely that Alpha should pay the damages. In addition, it is arguable that casinos are generally viewed by the public to have a secure financial status since the nature of the business is betting money on games of chance. In this Court's opinion there was no error or harm and, therefore, no miscarriage of justice to warrant a reversal under the plain error doctrine.

¶66. Alpha contends that the "send a message" statement at trial is inflammatory as evidenced by the "outlandish" jury verdict and constitutes reversible error. Again, this issue in the case sub judice is clearly barred for failure to contemporaneously object to the comment at trial. **Walker**, 671 So.2d at 597.

¶67. Procedural bar aside, the comment fails under the plain error doctrine. Alpha relies on **Payton v. State,** a criminal case, to support its contentions. In specific, Alpha contends that the same admonishment that applies in a criminal case should apply in a civil case, especially in the compensatory damage stage of the trial. In **Payton**, the prosecutor made a "send a message" comment in his closing argument. However, this Court declined to adopt a per se reversible error rule on "send a message" statements, but added that depending on the surrounding circumstances, the statement may constitute reversible error on its own. **Payton v. State**, 785 So.2d 267, 271 (Miss. 1999). After a review of Mississippi case law, there appears to be no civil "send a message" cases on point. In the case sub judice, the send a message statement does not constitute reversible error. Unlike the comment in **Payton**, which asked the jurors to "send a message" to the "older, more mature criminals," Jackson's counsel requested the jury to send a message directly to Alpha.

### 6. Did the trial court err in allowing Jackson to testify that he would have to report his arrest to the United States Army in future security clearance applications?

¶68. Alpha contends that the trial court erred in allowing into evidence testimony from Jackson relating to reporting his disorderly conduct arrest to the United States Army in a future security clearance application; Exhibit P-6, Jackson's Personnel Security Questionnaire Form DD398-2 from 1986; and Exhibit P-7, a blank National Agency Questionnaire Form DD398-2. According to Alpha, the admission of this evidence indirectly established that the arrest had a negative impact on Jackson's career and did not relate to his embarrassment. Even if the information did relate to his embarrassment, Alpha contends that the testimony and documents were prejudicial and had no probative value in light of Mississippi Rule of Evidence 403. This Court finds this contention without merit.

¶69. This Court has held that the standard of review for either the admission or exclusion of evidence is

abuse of discretion. ***Floyd v. City of Crystal Springs***, 749 So.2d 110, 113 (Miss. 1999). The Court will not reverse the admission or exclusion of evidence unless the error adversely affects a substantial right of a party. ***Id***.

¶70. Mississippi Rule of Evidence 401 defines relevant evidence as follows:

"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

¶71. Mississippi Rule of Evidence 403 states the following:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶72. The trial court denied Alpha's pretrial motion in limine to exclude this evidence. At trial, the trial court ruled in a bench hearing that the information was admissible. Jackson's counsel stated that Jackson has to list the arrest in his next security application within the next two years which is not speculative. Listing the arrest is a source of embarrassment and humiliation to Jackson. This testimony is relevant to damages in the case. Therefore, the admission into evidence of this information meets the threshold requirement of relevancy.

¶73. As to the probative va lue of the relevant evidence substantially outweighing the danger of unfair prejudice, the testimony and documents showed that the Jackson had to fill out the form in the near future and that regardless of the outcome of the disorderly conduct charge, it must still be reported to the military for security clearance. The form specifically requires the listing of any arrests. Jackson's counsel stated that the documents demonstrated embarrassment and humiliation to Jackson. The trial judge allowed the information and stated that if Jackson's counsel went into *any* speculation as to damages, then Alpha could object and the court would rule on the objection at that time. Testimony and documents that show either embarrassment or humiliation for the alleged claims and recovery of damages are highly relevant and probative. This Court finds that the trial judge did not abuse its discretion in allowing the testimony and documents into evidence. The probative value of the testimony and documents did not outweigh the danger of unfair prejudice.

### 7. Did the trial court err in allowing Jackson to introduce evidence of his evaluations as an Army officer into evidence?

¶74. Alpha contends that the trial court erred in admitting into evidence records pertaining to Jackson's Officer Evaluation Reports. Specifically, Alpha contends that (1) the admission of the reports is in violation of Rule 404 of the Mississippi Rules of Evidence; (2) such evidence is prejudicial and inadmissible if the defendant does not know the plaintiff nor is aware of his reputation; and (3) the records do not relate to Jackson's refusal to leave the casino.

¶75. This Court has held that the standard of review for either the admission or exclusion of evidence is abuse of discretion. ***Floyd v. City of Crystal Springs***, 749 So.2d at 113. The court will not reverse the admission or exclusion of evidence unless the error adversely affects a substantial right of a party. ***Id***.

¶76. Mississippi Rule of Evidence 404 states the following:

(a) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) Character of Accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution to rebut evidence that the victim was the first aggressor;

(3) Character of Witness. Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶77. This Court has held that in civil cases, generally, a party may not support its position with testimony concerning good character or reputation. *Miller Mut. Fire Ins. Co. v. King*, 232 Miss. 260, 267-68, 98 So.2d 662, 663-64 (1957). When good character and reputation are in issue; however, such as in a false imprisonment case, the evidence is admissible. *Id.* The Court in *Miller* further recognized that character may be in issue in cases involving *malicious prosecution* and in determining the right and extent of recovery. *Id.* at 268, 98 So.2d at 664. Alpha contends that there is an exception to Rule 404 for malicious prosecution cases only if the defendant knows the plaintiff and character. If the defendant does not know the plaintiff nor is aware of his reputation then the evidence is inadmissible and prejudicial. Further, Alpha contends that the reports and profanity do not related to whether Jackson refused to leave the casino.

¶78. As to the admission of the reports under Rule 404, this Court has held that when good character evidence is in issue, such as in cases of false imprisonment and malicious prosecution, evidence is admissible. As to the general rule for malicious prosecution cases cited by Alpha concerning a defendant's prior knowledge of reputation, this Court finds the outside case law cited in support of this position to be neither binding on this Court nor persuasive.

¶79. As to the contention that the reports and use of profanity are not related to whether Jackson refused to leave the casino, this Court finds that Jackson's character was directly at issue in trial and the documents were correctly admitted into evidence. The trial judge ruled that Jackson's character was called into question concerning his conduct at the casino and, therefore, the reports were admissible. Jackson was arrested and charged with disorderly conduct. There was conflicting testimony from both litigants' witnesses concerning the whether Jackson was loud, disruptive, and used profanity to initially warrant the casino wanting Jackson removed from the premises. Alpha employees further testified that Jackson, while in line at the main cage, was loud and disruptive. Since the conduct of Jackson was at issue in the disorderly conduct charge and his character was in issue, the trial court did not abuse its discretion in properly ruling that the reports were admissible at trial for the false imprisonment and malicious prosecution claims.

**8. Did the trial court err in refusing to grant Alpha's Motion for Leave to Question the Jurors?**

¶80. Alpha contends that the trial court erred in denying a motion for leave to question jurors. Upon inquiry by Alpha, the trial court generally allowed lawyers to contact jurors to inquire about their performance at trial, but the lawyers could not question the jurors regarding the basis for the verdict. Alpha contacted a few jurors, and one juror, on his own initiative, indicated that he thought some extraneous matters angered other jurors and influenced the verdict. Specifically, the juror stated that some jurors believed that there was a videotape of the blackjack table not provided by the casino and some believed that Alpha was hiding the tape. Alpha seeks a remand to instruct the trial court to inquire whether juror misconduct occurred in the event that this case in not reversed and rendered or if a new trial is not granted by this Court.

¶81. In *Gladney v. Clarksdale Beverage Co.*, 625 So.2d 407 (Miss. 1993), this Court adopted its own procedure to address juror inquiry under the Mississippi Rules of Evidence 606(b) which states the following:

> b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether **extraneous prejudicial information** was improperly brought to the jury's attention or whether **any outside influence** was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

(emphasis added).

¶82. In *Gladney*, this Court wanted to preclude a party from "fishing" for a way to change an undesirable conclusion in a jury verdict. *Gladney*, 625 So.2d at 418. In order to preclude the "fishing" there must be a balance between the right to inquire into a jury verdict and the rights of jurors to be free of harassment and secure in their jury verdict. *Id.* This Court sets forth the M.R.E. 606(b) analysis that if an allegation of juror misconduct arises; then, there is consideration as to whether an investigation is warranted. *Id.*

¶83. To determine if a duty to investigate arises, the proponent of the misconduct must make an adequate showing to overcome the presumption of jury impartiality. *Id.* "At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information." *Id*. at 419. While a minimum standard of good cause is acceptable, it is preferable to clearly substantiate that a "specific, non-speculative impropriety" occurred. *Id.* If a post-trial hearing is warranted, the trial court shall determine the sufficiency of the evidence under the standards. *Id.* "In the absence of a threshold showing of external influences, an inquiry into the juror verdict is not required." On the other hand, when a threshold showing is made, a post-trial hearing should be conducted by the court. *Id.*

¶84. In the case sub judice, the trial court denied Alpha's Motion for Leave to Question Jurors. The trial judge balanced the right to inquiry versus the right of jurors to be free of harassment and secure in their verdict. She considered counsels rendition of what type of testimony was given during trial on the issue of a

videotape for the blackjack table and case law provided to the court. From all the information, the trial court specifically determined that there was insufficient evidence and no showing of good cause to warrant further review of the issue.

¶85. The testimony from both Akins and Sutton indicated that the surveillance office generally tapes all activity at the casino, including blackjack tables. Neither men knew of a specific tape of the blackjack table. This Court finds that the trial court correctly determined that there was no threshold showing of external influence as to outside influence or extraneous prejudicial information, and, therefore, no inquiry into the juror verdict is required.

<strong><u>Cross-appeal statement of issues</u></strong>

**1. The trial court erred in failing to grant Plaintiff's Jury Instruction Number P-10, Subsection (7) requesting damages for mental anguish and emotional trauma caused by the arrest and prosecution of the Plaintiff.**

¶86. On cross-appeal, Jackson contends that the trial court erred in denying a portion of Jury Instruction P-10 relating to damages for mental anguish and emotional trauma caused by his arrest and prosecution. Jackson requests relief, but also states that if this Court reinstates the original verdict, then the error by the trial judge would be harmless.

¶87. Jackson is correct in his assertion that jury instructions relating to damages for mental anguish and emotional trauma caused by the arrest and prosecution are proper. ***Royal Oil***, 500 So.2d at 448. This Court finds, however, that the jury heard testimony pertaining to emotional distress and mental anguish suffered by Jackson. While the instructions did not specifically identify "mental aguish" or "emotional distress" the jury did have damage instructions pertaining to embarrassment and humiliation. Thus any error is harmless.

**2. The trial court erred in failing to allow Plaintiff to present evidence concerning the wrongful conduct of the Defendant in relationship to punitive damages and in failing to grant Plaintiff's Jury Instructions P-11, P-12, and P-13.**

¶88. On cross-appeal, Jackson asserts that the trial court erred in failing to allow him to present evidence concerning wrongful conduct of the defendant, Alpha, and in failing to grant Jury Instructions P-11, P-12, and P-13. Alpha contends that Jackson fails to rely on the applicable statute, Miss. Code Ann. § 11-1-65 (Supp. 2001), and that the statute supercedes some of the case law cited by Jackson.

¶89. The applicable Mississippi statute concerning punitive damages is § 11-1-65. This statute states in part the following:

(1) In any action in which punitive damages are sought:

(a) Punitive damages may not be awarded if the claimant does not prove by **clear and convincing evidence** that the defendant against whom punitive damages are sought **acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.**

(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first

determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.

(c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered.

(d) **The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount...**

Miss. Code Ann. § 11-1-65 (Supp. 2001) (emphasis added). The statute and case law specifically give the court the authority to initially determine whether the particular facts of a case merit the submission of the issue of punitive damages to the jury. *Id*. Miss Code Ann. § 11-1-65 (1)(d) (Supp. 2001). In ***Ross-King-Walker, Inc. v. Henson***, this Court held the following:

In determining the propriety of submitting the issue of punitive damages to the jury, the trial court decides whether, under the totality of the circumstances and viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard.

***Ross-King-Walker, Inc. v. Henson***, 672 So.2d 1188, 1191 (Miss. 1996). *See also* ***Summers v. St. Andrew's Episcopal Sch. Inc.,*** 759 So.2d 1203, 1215 (Miss. 2000); ***Wallace v. Thornton***, 672 So.2d 724, 728 (Miss. 1996); ***Thomas v. Harrah's Vicksburg Corp.***, 734 So.2d 312, 322 (Miss. Ct. App. 1999). Clearly, the trial court is the gatekeeper for the issue of whether punitive damages, in cases involving both intentional and non-intentional torts, should be submitted and considered by a jury.[1] ¶90. Punitive damages are assessed in extreme cases and are intended to be an example and warning to others. ***Wallace*** 672 So.2d at 728. "However, there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases.*" South Central Bell v. Epps*, 509 So.2d 886, 892 (Miss. 1987). This Court held that a plaintiff can recover punitive damages only if there is a demonstrated willful or malicious wrong or if there is gross, reckless disregard for the rights of others. ***Boling v. A-1 Detective & Patrol Serv., Inc.***, 659 So.2d 586, 588 (Miss. 1995).

¶91. False imprisonment is considered an intentional tort. Miss. Code Ann. § 15-1-35 (1995); ***City of Mound Bayou v. Johnson***, 562 So.2d 1212, 1218 (Miss. 1990). In addition, the Court in ***Mound Bayou*** recognized that malicious prosecution has been placed in the category of intentional torts on several occasions. Miss. Code Ann. § 15-1-35. This Court held that malicious prosecution is subject to the same statute of limitations as the enumerated torts in Miss. Code Ann. § 15-1-35. 562 So.2d at 1219.

¶92. The trial court ruling in the case sub judice did not allow the punitive damages to be submitted to the jury. The trial judge recognized, among other things, that Jackson stated that he did not use profanity or raise his voice and Sutton did not believe Jackson should be arrested. Notwithstanding the testimony, the trial court judge indicated that the evidence presented did not meet the clear and convincing evidence standard required by the punitive damages statute. This Court finds that the trial court, as the gatekeeper of whether the issue of punitive damages is to be submitted to the jury, correctly determined that the facts of the case do not support a hypothetical juror finding malice or reckless disregard for Jackson's rights. Accordingly, the trial court correctly determined that the jury instructions for punitive damages should not

have been granted to Jackson.

### 3. The Trial Court erred in failing to allow the Plaintiff to introduce evidence of existence of a videotape of the blackjack table (surveillance daily log sheets) and in failing to grant Plaintiff's Jury Instruction P-5.

¶93. Jackson contends that the trial court erred in denying a daily surveillance log sheet showing the existence of a videotape of the blackjack table into evidence. In addition, Jackson contends that Jury Instruction P-5 pertaining to the issue of spoliation should have been granted by the trial court. This Court finds both contentions to be without merit.

¶94. As stated above, the standard of review for either the admission or exclusion of evidence is abuse of discretion. *Floyd v. City of Crystal Springs*, 749 So.2d at 113. The court will not reverse the admission or exclusion of evidence unless the error adversely affects a substantial right of a party. *Id*.

¶95. The trial court, in the case sub judice, denied Jackson's amendment to the pretrial order on the day of trial to include the surveillance log which indicated video activity at the blackjack table. In specific, the trial court ruled that Alpha did not know prior to the day of trial that Jackson wanted to introduce the surveillance log into evidence and that Alpha would not have any way of challenging the document. Alpha stated that the document was not part of the pretrial order and, therefore, Alpha did not have a witness to explain the document; the document is speculative; and, the document cannot be authenticated. Jackson, on the other hand, contends that the log was produced in conjunction with the event in question and is part of the exhibit; the defendant produced the log and, therefore, there is no surprise; and the log is admissible under M.R.E. 802(6) as a business record. The document would be relevant to show that the casino does tape the game tables.

¶96. "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Terrain Enter., Inc. v. Mockbee*, 654 So.2d 1122, 1131 (Miss.1995). In the case sub judice, this Court finds that the verdict was in favor of Jackson, as such, any alleged error would be harmless and does not merit further review.

### 4. The Court erred in reducing the verdict of the Jury by Order of Remittitur in the sum of $500,000.00.

¶97. This contention is addressed in Alpha's issue number five above. This Court finds that the jury verdict in light of the remittitur was not so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and nor show that the jury verdict was actuated by passion, partiality, prejudice, or corruption. Therefore, the remittitur of $500,000.00 by the trial court is affirmed.

### CONCLUSION

¶98. For these reasons, the judgment of the Washington County Circuit Court is affirmed.

¶99. **AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL**.

**McRAE, P.J., DIAZ, CARLSON AND GRAVES, JJ. CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., WALLER AND COBB, JJ.**

**SMITH, PRESIDING JUSTICE, DISSENTING:**

¶100. In my view, the majority errs in affirming the award of damages in this case. The $500,000 damages via the remittitur awarded to Jackson are excessive and against the overwhelming weight of the evidence. The trial judge clearly acknowledged the excessiveness of the $1,000,000 verdict of the jury in reducing the verdict by remittitur. Jackson only produced evidence of $875.00 actual damages, thus the verdict was more than 1142 times actual damages incurred by Jackson. Even considering the remittitur, the damages remain extremely disproportionate so as to shock the conscience of the Court. Additionally, the damages are unreasonable and outrageous manifestly indicating that the jury verdict was actuated by passion, partiality, and prejudice.

¶101. The majority also errs in its treatment on the merits of the improper closing arguments made by Jackson's attorney. The majority has simply upheld an excessive verdict awarded to Jackson, who argued improperly to the jury and trial court the deep pockets of a casino who had the "ability to pay" and let's "send a message" to all these Greenville casinos.

¶102. I am compelled to dissent.

## I.

¶103. In determining whether a jury verdict is excessive, it is the consistent practice of this Court to compare the amount of the verdict with the amount of damages. *See, e.g., **Wells Fargo Armored Serv. Corp. v. Turner***, 543 So. 2d 154, 159 (Miss. 1989); ***Woolfolk v. Tucker*** 485 So. 2d 1039, 1044 (Miss. 1986); ***Biloxi Elec. Co. v. Thorn***, 264 So. 2d 404, 406 (Miss. 1972). In the case at hand, the jury awarded Jackson $1,000,000 in **compensatory** damages. Jackson accepted the trial court's remittitur of the verdict to $500,000. In light of the evidence of damages presented at trial, even the trial court's remittitur to $500,000 is excessive.

¶104. At trial, Jackson presented the following evidence of damages:

A. Cost of bail bond -- $125.

B. Attorney's fees in defending the charge of disorderly conduct -- $750.

C. Jackson testified that during the pendency of the prosecution, he was worried he would be charged with conduct unbecoming an officer.

D. Jackson testified he was embarrassed by the arrest at the casino. He was embarrassed to tell his family and friends about the arrest. He was embarrassed to tell his colleagues about the arrest.

E. Jackson testified he was embarrassed at the possibility of having to report the arrest on future security clearance applications. The security clearance applications were admitted ONLY for the purpose of showing embarrassment, not for the purpose of showing damage to Jackson's career. In fact, the trial court refused to allow Jackson to introduce any evidence for the purpose of showing the arrest's effect on his career because Jackson's deposition testimony indicated that such evidence would be speculative at best. There was, therefore, no evidence allowed at trial that might show any negative effect on Jackson's career, either prior to the action at hand or in the future. The damages instruction presented by Jackson and submitted to the jury did not list damage to Jackson's career as

a factor to be considered in determining damages. Therefore, it is of great concern that the majority includes a possible effect of the arrest on Jackson's career in its discussion of damages. Specifically, the majority states: "If the military found out about the arrest, then Jackson could be charged with conduct unbecoming of an officer, whether he was ultimately convicted of the misdemeanor or not." (Majority Op. ¶ 15). "Jackson was worried that the military might find out about the arrest. If the military found out about the arrest then Jackson could be charged with conduct unbecoming of an officer, regardless of whether he was ultimately convicted of the misdemeanor." (Majority Op. ¶ 54). The majority also relies on this Court's opinion in *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67, 77 (Miss. 1996), in which we noted that job applications commonly ask about arrests. This, again, is an observation regarding the possible effects of the arrest on Jackson's career. Jackson himself admitted that this type of evidence was totally speculative. There is absolutely no basis in this case for this discussion by the majority. There was certainly no evidence offered at trial to demonstrate damage to Jackson's career, and there should therefore be no legal discussion of such damage in this Court's opinion.

F. Jackson testified that he felt his reputation had been damaged. However, there was no other evidence introduced to show damage to Jackson's reputation. In fact, Jackson's evaluation forms after the arrest reveal no damage to his reputation as he has continued to receive high evaluations. There is simply no proof in this record of any such damage to Jackson's reputation.

G. Jackson experienced temporary soreness in his shoulders from the arrest and handcuffs. There were no physical injuries, save the transient soreness. More importantly, Jackson never sought medical attention or incurred medical expenses.

¶105. It is true this Court has recognized that there is difficulty quantifying monetary awards in cases of this nature. (Majority at ¶51, *citing Junior Food Stores, Inc. v. Rice*, 671 So. 2d at 76; *C&C Trucking Co. v. Smith*, 612 So. 2d 1092, 1106 (Miss. 1992)). Nevertheless, this does not warrant this Court's sanctioning of excessive verdicts unsupported by the evidence. Here, there is a lack of any evidence to support such claims.

¶106. We were faced with a similar issue in *Woolfolk v. Tucker*, 485 So. 2d 1039 (Miss. 1986). In that case, the plaintiff brought a malicious prosecution action after he was acquitted of disorderly conduct. This Court held that a damage award of $85,000 was excessive. The Court observed that the plaintiff required no medical attention; doubt or suspicions of the plaintiff's witnesses were only momentary; the plaintiff's personal income increased rather than decreased; and the plaintiff was never arrested or jailed. The Court stated there was no evidence to show the plaintiff had suffered any substantial physical, mental or economic damages as a result of the prosecution.

¶107. The majority attempts to distinguish *Woolfolk*, claiming that the videotape of Jackson's ultimately being taken into custody shows Jackson's demeanor and his verbal interaction with casino employees while in the holding area. While this is true, there is significant dispute about his verbal and physical actions and demeanor prior to Jackson's being taken into custody and prior to being placed in the holding area. The majority boldly claims that, "There were no acts by Jackson to justify this behavior. The videotape clearly proves this." Contrary to this claim, this is simply not true and is extensively disputed by both the first portion of the video and testimony by numerous casino employees. Paul Andrezejeweski, the blackjack dealer, testified that Jackson became very upset, "went into a rage," was calling the casino cheats, cursing,

called the casino employees "mother f------" and was "getting very loud and creating an embarrassing disturbance." Andrezejeweski called John Foley, the casino shift manager, and advised him, "John, we got a problem here." Foley told Jackson if he did not calm down he was going to be ordered to leave the casino. Leaving the casino table in a huff, Jackson knocked over a chair. Foley directed Security Officer Eric Sutton to ask Jackson to leave the casino. Sutton attempted to escort Jackson from the casino, but Jackson jerked his arm away from Sutton as shown on the videotape. Sutton testified that when he asked Jackson to leave he refused. Sutton asked Jackson a second time to leave. Again, he refused. Sutton testified that he asked Jackson a total of five times to leave the casino, but Jackson refused. Sutton asked Jackson to cash in his chips which were in his hand. Although Jackson placed them on the cage counter, he kept his hand on top of the chips and refused to give them to the clerk. Sutton continued to ask Jackson to leave, but he refused. This is consistent with Jackson's own testimony when he admitted that, "Mr. Sutton was saying, sir, would you please - -you need to cash your chips in and leave." Jackson was asked, "And he did that for the whole time that we watched it here on the video; is that correct?" Jackson replied, "That is correct, ma'am." The videotape at this point reflects that Jackson neither left, nor made any effort to cash in his chips as directed. Subsequently, by radio transmission the security supervisor, Anthony Akins, and another officer, Dewayne Kingdom, were sent to the scene. Akins testified that he observed and listened to Jackson and Sutton from a distance of 12 feet for approximately 2 or 3 minutes while Sutton was telling Jackson to leave, but that Jackson refused and was getting very loud and "out of hand." Akins said that Jackson began to point his finger back and forth and was touching Sutton. Akins then directed Kingdom "to go restrain Jackson at that point because patrons were passing, stoppin, looking, pointing and it was just out of control." Thus, the majority claims that there were "No acts by Jackson justifying the casino's actions," are simply not so, according to this record.

¶108. In the case at hand, aside from the undisputed $875 in actual damages, the only evidence presented was Jackson's own testimony that he was embarrassed by the arrest and felt that his reputation had been damaged. The security applications went solely to the question of embarrassment. Jackson suffered no lasting physical injuries and never sought medical attention for the temporary soreness in his shoulders. No evidence was allowed as to the effect of the arrest on Jackson's career, because even Jackson admitted that such was mere speculation. In my view, the compensatory damages awarded simply are not substantiated by the evidence. The jury award of $1,000,000 and the remitted judgment of $500,000 for compensatory damages are excessive as a matter of law.

## II.

¶109. The majority also errs in addressing two of the improper closing arguments made by Jackson's attorney, specifically the "send a message" statement and the "ability to pay" remarks. The Court does not rest solely on the procedural bars. Instead, the majority, by its extraneous comments in addressing the merits of these arguments, misleads the bench and bar.

¶110. In the criminal context, this Court has clearly expressed its displeasure regarding "send a message" language and has repeatedly condemned the "send a message" argument in criminal cases. *Payton v. State*, 785 So. 2d 267, 270 (Miss.1999) (citations omitted). We issued a direct warning to the bench and bar regarding such language in *Payton*. *Id.* at 271. This Court has declined to adopt a per se error rule, but has held that in certain contexts, the argument may constitute reversible error in and of itself. *Id.* In fact, the Court has stated that in the absence of a timely objection to such an argument, this Court still may review it on appeal if the argument is so inflammatory that the trial court should have objected on its own motion. *Id.*

In my view, the statements in the case at hand, also rise to the same inflammatory level. Even the language in the majority opinion borders on sanctioning such language in cases in which counsel asks the jury to send a message directly to a single defendant. The Court should condemn such tactics as they should not be improperly argued before a jury sworn to fairness and impartiality in arriving at a just verdict which would adequately compensate a plaintiff for injuries incurred. This is especially so where punitive damages instructions were not proper or allowed.

¶111. Also cause for concern is the majority's discussion of the "ability to pay" argument. The majority's implies that this Court will condone an "ability to pay" argument so long as the net worth of the defendant is not specifically stated. Furthermore, the sentence "it is arguable that casinos are generally viewed by the public to have a secure financial status" has no basis in the law or facts of this case.

¶112. This Court has recognized that evidence of financial worth is not admissible where the jury is not warranted in awarding punitive damages. *C&C Trucking Co. v. Smith*, 612 So. 2d at 1102. *See also Mutual Life Ins. Co. v. Estate of Wesson by Hall*, 517 So. 2d 521, 529 (Miss. 1987) Thus, the trial court correctly disallowed evidence of the casino's financial worth in this case. Counsel may not argue facts outside the evidence unless the fact is a matter of common knowledge. *Brown-Miller Co. v. Howell*, 224 Miss. 136, 79 So. 2d 818, 822 (1955). The majority's assertion that "casinos are generally viewed by the public to have a secure financial status since the nature of the business is betting money on games of chance" is not, in my view, what this Court would term a "matter of common knowledge." This is simply a comment outside the record with absolutely no evidence to support same. Furthermore, this Court has held that the argument that a defendant has the ability to pay a judgment is improper even where the defendant's net worth was not specifically stated. *See Savery v. Gray*, 51 So. 2d 922, 924 (Miss. 1951). Here, Jackson referred to the casino's deep pockets by saying "They've got it. They should pay it." He also referred to a video not in evidence and the "send the message argument." There is simply no place in our jurisprudence for such arguments about deep pockets or "ability to pay" especially when coupled with a reference to a video not in evidence and "send the message" by a plaintiff attempting to acquire a large, excessive verdict. Fairness is non-existent under these circumstances.

### III.

¶113. The judgment in this case should be reversed and the case remanded to the trial court for a new trial on the issue of damages.

**PITTMAN, C.J., WALLER AND COBB, JJ., JOIN THIS OPINION.**

1. Miss Code Ann. § 11-1-65 does limit the scope of punitive damage under the following instances:

1(g) The seller of a product other than the manufacturer shall not be liable for punitive damages unless the seller exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that caused the harm for which recovery of damages is sought; the seller altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought; the seller had actual knowledge of the defective condition of the product at the time he supplied same; or the seller made an express factual representation about the aspect of the product which caused the harm for which recovery of damages is sought.

(2) The provisions of Section 11-1-65 shall not apply to:

(a) Contracts;

(b) Libel and slander; or

(c) Causes of action for persons and property arising out of asbestos.